INTERAMERICAN REFINING CORPO-
RATION, a corporation of the State
of Delaware, Plaintiff,

v.

TEXACO MARACAIBO, INC., formerly
known as the Superior Oil Company
of Venezuela, a corporation of the State
of Delaware, Monsanto Company, a cor-
poration of the State of Delaware, Mon-
santo Venezuela, Inc., a Delaware cor-
poration, and American International
Oil Company, a Delaware corporation,
surviving corporation after merger of
Amoco Trading Corporation, a Dela-
ware corporation, Defendants.

Civ. A. No. 2808.

United States District Court
D. Delaware.

Jan. 7, 1970.

**1292**

Harold Shaffer, of Booker, Leshem, Green, Shaffer & Berl, Wilmington, Del., William F. Hamilton, Jacob Rassner and Francis H. Nicosia, New York City, of counsel, for plaintiff.

William S. Potter and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., Jerome Doyle and Floyd Abrams, of Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, of counsel, for defendant, Texaco Maracaibo, Inc.

S. Samuel Arsht, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John J. Macchia, Ronald S. Daniels, and John D. Canoni, of Townley, Updike, Carter &

Rodgers, New York City, of counsel, for defendant, American International Oil Co.

Robert H. Richards, Jr., E. Norman Veasey and Richard F. Balotti, of Richards, Layton & Finger, Wilmington Del., for defendants, Monsanto Co. and Monsanto Venezuela, Inc.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is an action arising under the United States antitrust laws, 15 U.S.C. §§ 1, 2, 15, commonly known as the Sherman and Clayton Acts. Plaintiff Interamerican Refining Corporation (Interamerican) alleges that defendants Texaco Maracaibo Inc., formerly the Superior Oil Company of Venezuela (Supven), Monsanto Company (Monsanto), Monsanto Venezuela, Inc. (Monven), wholly owned subsidiary of Monsanto, and Amoco Trading Corporation (Amoco), now survived by American International Oil Company, engaged in a concerted boycott designed to deny Interamerican Venezuelan crude oil required for its operations. Plaintiff seeks a judgment in treble the amount of damages suffered. Defendants have moved for summary judgment.[1]

Interamerican was incorporated in October, 1959. The principal stockholders were Mr. Yervant Maxudian, Dr. Miguel Moreno, General Felix Roman Moreno, and later Mr. José Marcano. Mr. Maxudian was the principal executive officer. Interamerican planned to process low-cost Venezuelan crude oil in a bonded refinery in Bayonne, New Jersey, and to export the products or sell them as ship's bunker in New York harbor, thus avoiding United States import quota and tariff restrictions.[2] Interamerican rented the Bayonne refinery

---

1. The original complaint contained five counts, only the first of which is in issue now. Plaintiff concedes that counts two through five, common law claims, are barred by the Delaware statute of limitations.

2. Plaintiff had obtained a license under Section 311 of the Tariff Act of 1930 as amended, permitting it to import oil into the United States, process, and export it without quota restrictions or tariff. Under the Act, plaintiff could sell one of its chief products, ship's bunker, in New York harbor.

from its owner, Petroleum Separating Company (Separating). One of the principal terms of the rental contract was a *force majeure* clause, designed to protect Interamerican, in the words of Mr. Maxudian, "if there was any interference, a change of administration in Venezuela where we couldn't get oil." The refinery was modified, at considerable cost to Interamerican, to meet its expected needs.

Defendants Supven and Monven held concessions from the Venezuelan government to explore for and produce crude oil. They were suppliers of crude oil, potential sellers to Amoco, a finding and trading company, and through Amoco to Interamerican. Defendant Monsanto neither produced nor traded crude oil and played no part in the events giving rise to this litigation. Plaintiff considers it responsible for the conduct of its subsidiary Monven.[3]

Interamerican completed modification of the Bayonne refinery on January 18, 1960. It received its first shipment of crude oil from Amoco on January 26, pursuant to a contract executed the preceding day. Amoco had obtained that shipment from Monven and diverted it from its intended destination. Amoco delivered two additional shipments, pursuant to contracts dated February 4, 1960, and February 16, 1960, the oil for which was supplied by Supven. Contrary to earlier assurances of a willingness to supply Interamerican's long-term needs, Amoco informed Interamerican on March

15, 1960, that it could make no further shipments of Venezuelan crude oil. Amoco was unable to obtain oil from its suppliers, it said, because the Venezuelan government had forbidden further sales which, directly or indirectly, reached Interamerican. Operations at Bayonne were temporarily suspended on March 19, when processing of the last shipment was completed. Amoco tried without success to secure other supplies of suitable crude oil, and Interamerican attempted itself to obtain Venezuelan crude oil from other sources, both directly and with the aid of a shell corporation as purchasing agent. All suppliers refused to sell without the explicit permission of the Venezuelan government.[4] Interamerican finally obtained one more cargo of Supven oil, but on August 15, 1960, it terminated operations.

Interamerican had notified Separating in April, 1960, of its difficulties and of its intent to invoke the *force majeure* clause in the rental contract. Arbitration on the contract commenced before a panel of the American Arbitration Association in September, 1960, and an award was made to Separating in December of that year. The award was confirmed by the Court of Appeals for the Second Circuit in November, 1961. 296 F.2d 124.

Plaintiff commenced this action against Supven and Monsanto by complaint dated March 6, 1964. The complaint was amended on July 22, 1964, to add Monven and Amoco.[5]

---

3. Because of its decision on this motion the Court need indicate no opinion as to the liability of Monsanto for the acts of its subsidiary.

4. Mr. Maxudian testified in the arbitration proceedings with Separating that Mr. Lewis of Phillips "told us when we said why aren't they selling us crude? He said, 'You know, Mr. Maxudian.' By that time we had been plastered all over the world with this boycott from the Venezuelan Government, and they knew the idiosyncrasies of the Minister of Hydrocarbons in Venezuela, and they were afraid to sell it to us." (Maxudian ar-

bitration affidavit p. 682, deposition p. 212.)

5. Plaintiff first attempted to bring an action in the Southern District of New York on July 10, 1963. That complaint named only Supven and Monsanto as defendants. The claim against Supven was dismissed for failure of prosecution. The instant action was commenced by complaint dated March 6, 1964, still naming only Supven and Monsanto. Monven and Amoco were added by amendment on July 22, 1964. The complaint was amended slightly on December 14, 1969, and on May 3, 1969, substantive changes were made. In the

The preceding are the basic facts on which plaintiff grounds its claim for treble damages. Suppliers Supven and Monven, trader Amoco, and unknown others are alleged to have conspired to destroy Interamerican's potentially profitable business. Plaintiff relies on the refusals to deal to establish a violation of the antitrust laws [6] and on the undeniable damages sustained as a result of inability to obtain oil.

Defendants do not deny the refusals to deal nor the fact of damage. They base their defense on the statute of limitations and on the fact that the Venezuelan government forbade them to deal with Interamerican. They ask the Court to hold that compulsion by a foreign sovereign is a complete defense to a claim under the antitrust laws, and that the uncontroverted facts establish that defense as a matter of law.

The events on which defendants rely must be understood against the background of several conditions. Dr. Moreno and Mr. Maxudian both had histories of political activity in Venezuela. Neither considered himself friendly to or befriended by the Betancourt regime which had come to power in 1959. Dr. Moreno testified that Betancourt represented a continuation of the Larrazabal regime under whose auspices he had spent some unhappy moments in jail. It is not clear that Moreno was a *persona non grata* in the official sense, but the Venezuelan press remembered him unfavorably as "a chief conspirator in the 1948 coup. * * *"

Mr. Maxudian had served as oil consultant to two presidents between 1937 and 1945, and had refused to continue in that capacity under Betancourt. He ad-

mits having refused to work for Betancourt and having referred to him as "the Lenin of Latin America." According to the then president of Interamerican, both Mr. Maxudian and Dr. Moreno anticipated a change in the administration in Venezuela, that change being the reinstatement of Dr. Moreno.

The second condition is the relationship of the Venezuelan government to foreign oil concerns doing business there. These concerns hold their concessions subject to regulation by the government through the Ministry of Mines and Hydrocarbons. In April, 1959, that ministry established the Coordinating Commission for the Conservation of Commerce and Hydrocarbons (Coordinating Commission). The Coordinating Commission supervised concessionaires rigorously and conducted regular reviews of their sales policies. It also promulgated rules regarding the sale of oil extracted there. Those rules constituted "conditions for any shipment of Venezuelan petroleum to be made abroad." [7] Sanctions for violation of the rules included suspension of the right to ship oil out of the country. [8]

The third condition is the peculiar situation of Interamerican in the oil industry. Interamerican could buy, process, and sell without regard to import quotas or tariffs as long as it sold only for export or in New York harbor. It would therefore sell at prices lower than other companies subject to the tariff and import quotas and would sell entirely to foreign markets, two factors of concern to the Venezuelan government.

Soon after Interamerican received and began to process the first shipment

---

final amendment, allegations of fraudulent concealment were added, as were the common law counts. That amendment also named March 10, 1960, as the starting date for the boycott.

6. Klor's Inc. v. Broadway and Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 2d 741 (1959) ; Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

7. Response of Dr. Eduardo A. Acosta Hermoso, Director of the Technical Office of Mines and Hydrocarbons during the period in question, to question #20 of letters rogatory taken in Caracas, Venezuela, Sept. 23, 1968.

8. In fact, Supven was suspended on August 21, 1960, from selling its petroleum abroad, for violation of these rules.

of oil, Venezuelan authorities indicated their disapproval of sales to it by the concessionaires. The press reacted with considerable clamor both to the prices at which oil was sold to Interamerican and to the role of Dr. Moreno in the scheme. Articles of the day refer caustically to Dr. Moreno's new role as oilman and report official concern with the effect of sales to Interamerican on the stability of world oil prices. The Minister of Mines and Hydrocarbons is quoted announcing that "an end will be put to it."[9] *Carta Semanal*, weekly publication of the Ministry of Mines and Hydrocarbons, described as "a medium of information of some of the activities of the Ministry * * * and likewise containing data and information taken from technical manuals from abroad or locally," refers to investigations by the Coordinating Commission in the February 13, 1960, issue as follows:

"The third and more recent of the cases concerns a negotiation effected by and between the Amoco Trading and, a Venezuelan unidentified petroleum producer, to import petroleum into the United States outside the quota of the restriction program, and reexport it in the form of products to European and Canadian markets. There is involved in the negotiation petroleum from Maracaibo Lake, Venezuela; the petroleum was sold at prices below the quotation prices; the new firm Inter-American Refining Corporation, whose Venezuelan representative is Dr. Miguel Moreno, Secretary of the Government Junta that rose into power following the Coup d'Etat of 1948, appears to be the intermediary."

The Coordinating Commission called officials of both Supven and Monven before it on March 2 and March 4, respectively. The two companies were then instructed that no further Venezuelan oil was to reach Interamerican.

The parties have much to say about the reasons for Venezuelan antipathy to Interamerican. Interamerican maintains that none of the reasons given by the government stand up under scrutiny, that their fragility is persuasive that no order was given. Certainly abnormal discounts cannot account for all the excitement. Interamerican was not the only company getting oil from Supven at below posted prices and Interamerican's offer to pay higher prices had no effect on the ban.

According to Monven's representative, the Commission was concerned that Interamerican might violate U. S. import laws and that certainly it would violate Venezuela's policy against sales to unnatural markets, e. g., Canada and Europe. In addition, it appears that the government opposed any sales to a bonded refinery in New York harbor, because of the low prices at which such a refinery could sell.[10] The March 5, 1960, issue of *Carta Semanal* discussed the results of the hearings with the companies as follows: "The companies showed good acceptance of these plans and agreed to suspend the shipments of petroleum that might unbalance the natural markets of Canada, or determine the price structure through transactions like the structure of the Inter-American."

Whether or not such concerns were valid, it appears that they were indeed held. Both Dr. Acosta and Dr. Perez refer to them. Given Interamerican's stated purpose to produce only for export, its sales would inevitably find their way to "unnatural markets."

The presence of Dr. Moreno also had an effect on the fate of Interamerican. As indicated, both the regular press and *Carta Semanal* identified him with the

9. *El Nacional* 2/12/60, p. 1., Exhibit B to affidavit of Walter Mengden in support of motion.

10. Affidavit of Frank Leiva for the arbitration proceedings, in which he refers to the reasons given him by Dr. Perez for the government's opposition, quoted in defendants' reply brief, p. 25.

.inta replaced by Betancourt. The following colloquy between Mr. Frank Leiva, Interamerican's emissary, and Dr. Perez, is instructive:

"Perez: Dr. Moreno is interested in that company. You know our feelings about Dr. Moreno.

Leiva: Suppose Dr. Moreno were to get out of the company, would that help?

Perez: That would be of great material help if he were to get out of the company." [11]

After receiving their orders from the Coordinating Commission, Monven and Supven notified Amoco that no further oil from them was to reach Interamerican. Amoco then notified Interamerican.

Interamerican's further efforts to procure oil through use of Hydrocarbons Ltd., Mr. Leiva's Bahamian shell, failed, as each producer who learned of the ultimate purchaser insisted on protective clauses in the sale contract. Mr. Leiva made two trips to Venezuela to attempt to intervene one behalf of Interamerican, the first of which succeeded in having one cargo released. But Supven, the supplier of that cargo, refused to ship further without the permission of Dr. Perez. Mr. Leiva was unable to secure further permission.

At the arbitration proceedings, plaintiff vigorously maintained that the Venezuelan compulsion had deprived it of the ability to obtain oil, and that such compulsion was within the *force majeure* clause of the contract. It introduced substantial evidence to prove the compulsion, but, as previously noted, the arbitrators made an award against it.

Interamerican admits that it has now reversed its position with regard to the good faith of its suppliers. It maintains that the arbitration award against it and the introduction at those proceedings of a certain letter written by Dr. Perez, Minister of Mines and Hydrocarbons, convinced it that defendants had not told it the truth.[12]

■ Plaintiff insists that the evidence which it subsequently discovered, as well as the facts which are undisputed, raise issues of fact requiring trial on the merits. If the evidence, when viewed in the light most favorable to plaintiff, discloses such issues, defendants' motion for summary judgment must be denied. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

■ The Court concludes, however, for reasons hereinafter stated, that the undisputed facts demonstrate that defendants were compelled by regulatory authorities in Venezuela to boycott plaintiff. It also holds that such compulsion is a complete defense to an action under the antitrust laws based on that boycott.

Because summary judgment is granted to all defendants on the ground stated, it is not necessary to decide the applicability of the statute of limitations.

## THE LAW OF COMPULSION

No party presents dispositive authority that such acts as occurred here do or do not immunize trade restraints other-

11. Leiva's arbitration affidavit, p. 216, affirmed in his deposition, p. 38.

12. Plaintiff became aware of the Perez letter during the arbitration proceedings, on October 27, 1960. It maintained its position that the letter was of no effect and that defendants had indeed been compelled by Venezuelan authorities through appeals to the United States District Court for the Southern District of New York and the Court of Appeals for the Second Circuit, as well as in a petition to the United States Oil Import Appeals Board on March 26, 1962. In July, 1962, Interamerican's present counsel was retained by Mr. Maxudian, and defendants were notified in November of that year that plaintiff had "incontrovertible proof" that it was untrue that Venezuela compelled the boycott. Plaintiff does not allege receipt of any other facts between March, 1962, and the commencement of the present action which caused it to reverse its perception of the events which had occurred. See Maxudian Deposition, 217–228.

wise illegal. The statement in Sabre Shipping Corp. v. American President Lines, Ltd., 285 F.Supp. 949 (S.D.N.Y. 1968), at 954, relied on by plaintiff, is not controlling. Judge Ryan's opinion, on a motion to dismiss, properly held that allegations that the unlawful activities were engaged in at the direction of the Japanese government were a matter for defense. His additional comment that if established such allegations might not immunize defendants, even if read literally, only reserves judgment on the conditions under which such direction might not be a defense.

Such conditions were present in Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) and United States v. Sisal Sales Corp., 274 U.S. 268, 47 S. Ct. 592, 71 L.Ed. 1042 (1927). In *Continental Ore*, Union Carbide's subsidiary, Electro Met of Canada, had been appointed by the Canadian government to be exclusive wartime purchasing agent for vanadium. That appointment did not immunize a conspiracy with the parent to monopolize vanadium production and sale. "Respondents are afforded no defense from the fact that Electro Met of Canada, in carrying out the bare act of purchasing vanadium from respondents rather than Continental, was acting in a manner permitted by Canadian law." 370 U.S. at 706–707, 82 S.Ct. at 1414.

In *Sisal Sales* defendants secured a monopoly through discriminatory legislation in Mexico and Yucatan. The Court held that inasmuch as the conspiracy was entered into and overt acts performed in this country, jurisdiction existed, and the legislation procured by the conspiracy was beside the point. "True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States." 274 U.S. at 276, 47 S.Ct. at 594.[13]

Nothing in the materials before the Court indicates that defendants either procured the Venezuelan order[14] or that they acted voluntarily pursuant to a delegation of authority to control the oil industry. The narrow question for decision is the availability of genuine compulsion by a foreign sovereign as a defense.

Defendants rely on dicta in *Continental Ore*, supra,[15] and in United States v. The Watchmakers of Switzerland Information Center, Inc., 1963 Trade Cas. ¶ 70, 600 (S.D.N.Y.)[16] and

13. The court in *Sisal Sales* distinguished the case of American Banana Co. v. United Fruit Company, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) which might otherwise have provided a basis for the holding here. In *Banana*, Mr. Justice Holmes, for the court, held that the prohibitions of the Sherman Act did not extend to acts done in foreign countries, and that the fact that the conspiracy began in the United States did not make acts, legal in Costa Rica, illegal here. 213 U.S. at 357–359, 29 S.Ct. 511. He stated that even if defendants induced the Costa Rican government to injure plaintiff, there could be no inquiry into the motives of that sovereign state. 213 U.S. at 358, 29 S.Ct. 511. *Sisal Sales*, however, must restrict *Banana* to those cases where the conspiracy has no effect within the United States. Since the effect of the acts in the instant case was directly felt in the United States, federal jurisdiction is present, and, although the rationale of *Banana* is relevant to the principles here involved, that decision provides neither sufficient nor essential support for the result here.

14. Even if the order were procured, or induced, defendants would be immune if United States commerce were unaffected. American Banana Company v. United Fruit Company, supra. The effect of showing the order to be induced is to establish a conspiracy, which would bring the present case within *Sisal Sales*. The holding here is that, federal jurisdiction being present, a showing of bona fide compulsion by a foreign government immunizes an otherwise illegal boycott.

15. In *Continental Ore*, the court pointed out that there was "no indication that the Controller or any other official * * * directed that purchases from Continental be stopped." 370 U.S. at 706, 82 S.Ct. at 1414.

16. In *Watchmakers*, Judge Cashin held that a collective agreement could form a conspiracy notwithstanding that it was

on language in some consent decrees [17] to establish the defense. Without more, these would be scant authority. It requires no precedent, however, to acknowledge that sovereignty includes the right to regulate commerce within the nation. When a nation compels a trade practice, firms there have no choice but to obey. Acts of business become effectively acts of the sovereign. The Sherman Act does not confer jurisdiction on United States courts over acts of foreign sovereigns. By its terms, it forbids only anticompetitive practices of persons and corporations.[18]

■ In his book, *Antitrust and American Business Abroad,* Professor (now President) Kingman Brewster states a proposition which should be self-evident. Anticompetitive practices compelled by foreign nations are not restraints of commerce, as commerce is understood in the Sherman Act, because refusal to comply would put an end to commerce. Brewster 94. American business abroad does not carry with it the freedom and protection of competition it enjoys here, and our courts cannot impose them. Commerce may exist at the will of the government, and to impose liability for obedience to that will would eliminate for many companies the ability to transact business in foreign lands. Were compulsion not a defense, American firms abroad faced with a government order would have to choose one country or the other in which to do business. The Sherman Act does not go so far.[19]

■ Plaintiff maintains that even if compulsion is a good defense, the acts of compulsion must be valid under Venezuelan laws. It urges the Court to consider the affidavit of a Venezuelan attorney to the effect that the Minister of Mines and Hydrocarbons had no authority to bar sales of crude oil to anyone and that no officer had authority to issue binding orders without putting them in writing and publishing them in the *Gazeta Oficial.* Since not legal, says plaintiff, the orders were not "compulsive."

■ This Court may not undertake such an inquiry. In Banco Nacional de

---

permitted by the laws of Switzerland. He added, "If, of course, the defendants' activities had been required by Swiss law, this court could indeed do nothing." 1963 Trade Cases, ¶ 70, 600, at 77,456.

17. See the decrees in United States v. Gulf Oil Corp. 1960 Trade Cas. ¶ 69, 851 at 77,349 (S.D.N.Y.), United States v. Standard Oil Co., 1960 Trade Cas. ¶ 69, 849 at 77,340 (S.D.N.Y.).

18. This is analogous to the theory stated in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) holding that compliance with a state regulatory program does not subject individuals to antitrust liability. The Sherman Act refers only to persons, not to states or nations, and both the Act and the Constitution would be badly misinterpreted to permit liability for acts of a sovereign.

See also Brewster, Antitrust and American Business Abroad (1958), 94, and Fugate, Antitrust Jurisdiction and Foreign Sovereignty, 49 Va.L.Rev. 925 (1962), at 932, where it is said:

"The real question is *whose* acts are the subject of inquiry. If the acts are those of a foreign government within its own jurisdiction, then the antitrust exception applies. The situation is the same if the foreign government through its laws, regulations, or orders, requires private parties to perform the anticompetitive acts. If, on the other hand, the acts complained of are in reality those of private parties who seek to hide behind the cloak of foreign law, the courts will attach antitrust liability."

Also Fugate, Foreign Commerce and the Antitrust Laws (1958) §§ 2.16, 2.17.

19. In 1955, the Attorney General's Committee to Study the Antitrust Laws reported that:

"* * * should the laws of another country require uniform non-competitive prices by companies doing business there, then compliance with that law should constitute a defense in this country to an antitrust charge of price fixing solely in that country." Report of the Attorney General's Committee to Study the Antitrust Laws (1955), p. 83, quoted in Fugate, Foreign Commerce and the Antitrust Laws (1958) 148.

Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court held that it could not explore the validity under Cuban law of acts of expropriation by the Castro government. The act of state doctrine, based upon proper concepts of sovereignty and separation of powers, commands that conduct of foreign policy reside exclusively in the executive. For our courts to look behind the acts of a foreign government would impinge upon and perhaps impede the executive in that function. Whether or not Venezuelan officials acted within their authority and by legitimate procedures is therefore not relevant to the instant case.

Plaintiff's attempt to limit *Sabbatino* to expropriation decrees finds no support either in the holding or the rationale of that case. The principal decision relied on in *Sabbatino* dealt with a tort claim for refusal to grant a passport, unjustified confinement, assault, and abuse. Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). Other cases have applied it to lesser government acts. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 646–647 (2d Cir. 1956) cert. denied 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956) (trademark). The reasons of policy which support the doctrine would hardly be served by limiting it to acts of expropriation.

## THE PROPRIETY OF SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When either party moves for summary judgment the opposing party must respond with specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

If the proper showing is made, summary judgment is as appropriate for a defense as for a claim. 6 Moore, Federal Practice ¶ 56.17[4].

Plaintiff asserts that the evidence of compulsion is indirect, circumstantial, and oral, therefore insufficient. Consequently, according to plaintiff, issues of fact arise as to defendants' asserted defense. Neither law nor the record support such a position.

Both Mr. Walter Mengden, then president of Supven, and Mr. Frank Richardson, a Monven vice president, state that Venezuelan officials told them that sales to Interamerican must cease. Their testimony is neither circumstantial nor indirect; rather it is persuasive proof that such events occurred. Plaintiff offers no reason to doubt their credibility and no facts to contradict them.

Additionally, newspapers of the day and articles in *Carta Semanal*[20] report official concern by mid-February with Interamerican's bonded status and with the role of Dr. Moreno as its president and large stockholder. Officials are said to be determined to end its purchases.[21]

The testimony of Mr. Frank Leiva,[22] offered on behalf of Interamerican at the arbitration, and affirmed in deposition for this litigation, is also strong evidence of compulsion. Mr. Leiva says he met with Dr. Perez in an effort to remove obstacles to Interamerican purchases. At that meeting, Dr. Perez informed him that "the Venezuelan govern-

20. See quote from *Carta Semanal* 2/13/60, supra, p. 1295.

21. See note 9, supra, and accompanying text.

22. It is not clear from plaintiff's evidence whether Mr. Leiva was a stockholder or a creditor of Interamerican in 1960. He did advance $200,000 from his company, Imperial Export, and Imperial guaranteed $400,000 credit for one oil shipment. According to Mr. Maxudian, Leiva could not decide whether the advance was a loan or payment for stock. Leiva says he never was issued stock. In either event, Mr. Leiva had a substantial stake in the prosperity of Interamerican.

ment was opposed to any sales to a bonded refinery in New York harbor."[23] Leiva also states that he there learned of the opposition to Dr. Moreno, whose prosperity was apparently not a condition devoutly to be wished by the Betancourt regime.[24] Although he submits an affidavit in opposition to the present motion, nothing therein rebuts the facts thus established.

 Both sides ask the Court to hold the other in some way bound by the decision of the arbitration tribunal. Plaintiff maintains that the award is persuasive precedent that no compulsion took place. Defendants insist that plaintiff is precluded by the position it took there from now denying compulsion. Neither position has merit.

The basis of the arbitration award is not announced. Although the arbitrators might have determined that no compulsion took place, it is as likely that they construed the *force majeure* clause not to include interference by the Venezuelan government. Even if the rationale were clear, defendants could not be bound by such a determination to which they were not parties. 1B Moore ¶ 0.411[1], 0.441 [2].

Defendants point to this Court's opinion in Old Charter Distillery Co. v. Continental Distilling Corp., 174 F.Supp. 312 (D.Del.1959) to show that Interamerican is precluded from denying facts it once affirmed. In that case defendant urged the dissimilarity of trademarks it had earlier admitted and alleged to be similar. Defendant offered no new facts to explain its change of position.

Here, however, plaintiff's reversal is more legitimate. It seeks to accurately establish a conclusion about which it was mistaken earlier. If new information has become available which puts a different cast on the facts originally known, plaintiff should not be prohibited from showing that the ultimate fact is not what it once believed. 1B Moore ¶ 0.405[8].

 Plaintiff's opposition to defendants' motion is based essentially on what it terms denials by Venezuelan officials that they ordered cessation of sales to any company. This evidence consists of a letter from Dr. Perez to Mr. Sylvan Marshall, counsel for Separating at the arbitration, and of responses by Dr. Perez and Dr. Acosta to letters rogatory.

For a number of reasons, the letter may not be considered. First, plaintiff refers to no exception to the hearsay rule which would permit introduction of the letter at trial as proof of its contents. IV Wigmore, Evidence, 1360, 1361, VI Wigmore 1766 (3d ed. 1940). Rule 56 (e) provides that affidavits in opposition to motions for summary judgment "shall set forth such facts as would be admissible in evidence." Plaintiff's offer of the letter by affidavit of its former counsel is improper. The letter may not be considered without the affidavit of its author. Edward B. Marks Music Corp. v. Stasny Music Corp., 1 F.R.D. 720 (S.D.N.Y.1941), 6 Moore ¶ 56.11[1].

Secondly, Dr. Perez refused to authenticate the letter when given the opportunity.[25] The defect thus goes beyond the mere form of its presentation.

But even were the letter to be authenticated and properly introduced at trial, its contribution would be insignificant. Dr. Perez's responses to specific questions regarding Interamerican are vague and equivocal. He stated that the ministry had not prevented any producing company from selling Venezuelan oil except in markets "which are not natural markets. * * *" Since Interamerican planned to sell in export, and since export sales were potentially to "unnatural markets," the statement falls short of a denial.

---

23. Note 10, supra, and text.

24. Note 11, supra, and text.

25. Dr. Perez was not compelled to authenticate the letter by the Venezuelan magistrate presiding over the letters rogatory, but he went out of his way to deny his ability to authenticate it.

What Dr. Perez does deny is knowledge that any person officially representing Interamerican discussed problems of petroleum purchase in Venezuela, as well as knowledge of Dr. Moreno's connection with Interamerican, other than press references.[26]

Plaintiff asserts finally that Dr. Perez "denies" government action forbidding sales to Interamerican in his responses to letters rogatory. The Court's examination of these responses, translations of which were not available at oral argument, leaves it astonished at plaintiff's lack of interpretative candor. Far from denying such action, Dr. Perez states that enforcement of the price policy could cause concessionaires to "revise in their turn the sales policy to be followed." Revision of sales policy is just what defendants say they did. They do not maintain that agents stood with guns at the wharves. When the Coordinating Commission made its desires known, they took the necessary steps to comply.

Plaintiff also relies on the answers of Dr. Acosta, Director of the Technical Office of Mines and Hydrocarbons, to similar letters rogatory. Somewhat less evasive than Dr. Perez, Dr. Acosta states that conversations took place during which objections were raised to sales to Interamerican, and that the companies agreed to suspend sales "that might cause an imbalance in the natural markets of Canada and a deterioration in the price structure through transactions as in the case of Inter-American." Viewed as a whole, his testimony leaves the clear impression that the Ministry took strong official action. Nothing he says could be construed to establish a conspiracy to induce whatever restraints were imposed,

much less to raise an issue of fact as to the occurrence *vel non* of Ministry action.

The Court concluded earlier that for it to inquire into the validity of the acts of a foreign state would violate the act of state doctrine. Banco Nacional de Cuba v. Sabbatino, supra. Plaintiff now contends that whether or not action taken by the Ministry was "compulsive" is a question of fact. It urges that it be permitted to show at trial that the order was not binding because oral and without legal authority. For the same reasons as those announced above,[27] whether the act was legal or "compulsive" under the laws of Venezuela is no more a proper inquiry for the jury than it is for the Court. Plaintiff correctly states that whether or not a foreign official "ordered" certain conduct is an evidentiary question.[28] But the factual inquiry is limited to the existence of the officer and the order. Once governmental action is shown, further examination is neither necessary nor proper.

█ The Court must conclude that the evidence relied on by plaintiff presents no issue of material fact and that trial is not necessary to resolve differing versions of the truth. Accordingly, summary judgment, pursuant to Rule 56 is appropriate. This conclusion is not reached lightly, for complex antitrust litigation often ripens late into full-blown factual disputes, and the party charged with conspiracy has the truth particularly within his control. Summary judgment is not to function as a substitute for trial on the merits, and where any view of the evidence discloses a dispute over material facts, or where such dispute might reasonably arise from fuller discovery, termination under Rule

26. It will be remembered that Mr. Leiva states that he met with Dr. Perez and that they discussed Interamerican's difficulties and specifically dealt with the role of Dr. Moreno. While Mr. Leiva may not have been an "official" of Interamerican, and Dr. Perez may be technically correct in all he says, his letter is so evasive, if not equivocal, that, taken as a whole, it cannot raise a *genuine* issue of fact.

27. Page 1298, supra.

28. Graziano, Foreign Governmental Compulsion as a Defense in United States Antitrust Law, 7 Va.J.Int.Law 100 (1967), at 144. Pl. brief, p. 43.

56 is improper. Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Sartor v. Arkansas Natural Gas Co., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

In the instant case, discovery is complete. Plaintiff's counsel informed the Court that he was prepared to go to trial one month after this opinion. He stated that, with the exception of having the Perez letter authenticated, his preparation was finished. Any issue of fact which would arise at trial should appear now on the face of the materials in his control.

The Court has searched those materials and finds no evidence to create an issue of fact. The three bits of evidence on which plaintiff relies are insufficient. They are not inconsistent with some sets of facts which, if proved, would support a cause of action. But they fall short of calling into dispute the basic element of the defense—that defendants complied in good faith with Venezuelan regulatory authorities. There is no evidence that the compulsion was sought or induced by the defendants and there is undisputed evidence to the contrary.

Plaintiff's position is essentially this. Having established refusal to sell by two or more defendants, it is entitled to have the jury make the proper inferences from that fact. Nothing defendants present can explain away or sanitize that fact sufficiently to make trial unnecessary. In support of its argument that the inference of motive is proper, plaintiff submits that its bonded status and consequent market advantages so threatened defendants' customers and refineries owned by parents and affiliates of defendants that defendants resolved to drive it out of business.

The position has two defects. It ignores defendants' right to show that participation in what might otherwise be an illegal boycott is immunized by acquiescence in the order of a foreign government. Secondly, it overlooks the principle clearly articulated in the recent case of First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), that uncontradicted evidence explaining the fact from which a contrary inference is sought justifies summary judgment. The rationale of the compulsion defense is set out above.[29] That the holding in *Cities Service* also supports the decision here is demonstrated below.

In *Cities Service,* the Supreme Court affirmed summary judgment against a plaintiff whose evidence corresponded closely to that offered here. It had produced nothing substantial other than defendant's abrupt termination of negotiations with it. It asserted, however, that under the earlier holding in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), summary judgment was improper when any evidence of conspiracy was present and motive was a substantial issue. 391 U.S. at 285, 88 S.Ct. 1575. The Court distinguished *Poller* and similar cases [30] on the ground that they had all presented factual situations making the inference of motive logical. In those cases it was plausible to argue from the circumstances that a plan had been formed to drive plaintiff out of business. In *Cities Service,* it was "much more plausible to believe that Cities' interests coincided, rather than conflicted, with those of petitioner." 391 U.S. at 285, 88 S.Ct. at 1591.

The inference of motive is likewise unwarranted here. Plaintiff offers no evidence that defendants' customers were in fact threatened or that they urged defendants to take any action. Indeed, it offers no evidence as to the identity of the customers it alleges to have threatened, their market positions, sales

---

29. See discussion beginning p. 1296, supra.

30. Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939) and Theatre Enterprises, Inc. v.

Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), cited in *Cities Service,* 391 U.S. at 286, 88 S.Ct. 1575.

outlets, or relative prices. Additionally, it ignores the limited effect its own advantages would have on the domestic American Oil scene. By its nature, it would sell oil only to foreign countries and in New York harbor. Defendants' customer refineries selling in the domestic market would not be affected at all. For the same reason, affiliated domestic refineries of Monsanto and Amoco could ignore the Bayonne activity. Although without more, it is possible to imagine conflict between plaintiff and some actual or potential customers of defendants, the inference that defendants' refusal to sell was the product of factors other than conspiracy is at least equal to the inference that it was due to conspiracy, thus negating the probative force of the evidence showing such a refusal, but the former inference is more probable, as will be shown below. *Cities Service,* supra, at 280, 88 S.Ct. 1575. The effect of plaintiff's one piece of probative evidence is additionally neutralized by undisputed evidence that defendants urged plaintiff to send representatives familiar with Venezuelan politics to the government to attempt to have the ban removed. There is no reason to doubt that defendants were eager to sell to plaintiff, for there was a surplus of low-cost Venezuelan crude oil available. Plaintiff's own testimony is to the effect that Amoco went to considerable lengths to obtain oil from other sources suitable for the Bayonne facilities.[31]

In addition to the absence of significant evidence from which an inference of motive would have been proper, the Court in *Cities Service* also found that defendant had supplied it with an "overwhelming amount" of evidence explaining the termination of negotiations with plaintiff. The Court stated:

"* * * it is apparent that petitioner's main argument is that Cities' failure to follow through on its original substantial interest in dealing with him is substantial evidence of participation in the boycott allegedly organized by the other defendants. And undoubtedly, given no contrary evidence, a jury question might well be presented as to Cities' motives in not dealing with Waldron, cf. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), notwithstanding that such a failure to deal conceivably might also have resulted from a whole variety of nonconspiratorial motives involving the exercise of business judgment as to the attractiveness of the opportunity offered by petitioner. However, as we next show, the record in this case contains an overwhelming amount of such contrary evidence of Cities' motives, much of it supplied by petitioner himself." 391 U.S. at 277, 88 S.Ct. at 1587.

Defendants here have also offered an overwhelming amount of contrary evidence. That evidence is unrebutted, and, as in *Cities Service,* much of it is supplied by plaintiff himself.

The effective demonstration of compulsion precludes an inference of illegal conduct. When defendants explained their refusals to sell with uncontradicted evidence of a legal excuse,[32] the burden fell upon plaintiff to demonstrate issues of fact in regard to the explanation. As

---

31. The testimony of Interamerican's officers goes so far to exonerate Amoco that one wonders why such a good friend was made a defendant. In its responses to interrogatories, Interamerican said that Amoco exhausted "every possibility in order to obtain crude oil from foreign sources to enable plaintiff to meet its charter and processing contract objectives." Mr. Maxudian said that Amoco made "every effort to obtain crude oil for us at a price that we could economically process and continue our business."

32. Participation in an illegal boycott is, of course, not excused by the fact that a defendant was coerced into joining by threats or pressure from others. United States v. Paramount Pictures, Inc., 334 U.S. 131 at 161, 68 S.Ct. 915, 92 L. Ed. 1260 (1948). Otto Milk Company v. United Dairy Farmers Cooperative Association, 388 F.2d 789 (3d. Cir. 1967) at 797. The Supreme Court noted the line of cases dealing with economic coercion as a defense in *Cities Service,* but declined to pass on that theory because of the state

indicated by the lengthy analysis of the evidence conducted above, no such issue is present on this record.

In conclusion, this case is clearer than *Cities Service* for summary judgment. There is no evidence of conspiracy or of motive to boycott Interamerican. The relationship among supplier, trader, and refiner was essentially symbiotic, profitable to all, and nothing supports any other theory. What the uncontradicted evidence does show is that defendants were eager to sell to plaintiff, that they acted in good faith before and after the ban, and that all refusals to deal were based on compliance with authority which was in the words of Professor Brewster, "in fact, a *sine qua non* of doing business." Brewster, 92.

To permit this litigation to go beyond summary judgment would be improper as well as futile. The ends of justice and proper judicial administration require that it be terminated now.

Submit order in accordance herewith.

of the record. See footnote 16, 391 U.S. at 280, 88 S.Ct. at 1588, in which are cited Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 2d 741 (1959), and United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Nothing stated in this decision calls the principles of any of those cases into question. They are sufficiently distinguished by the fact that they did not deal with anticompetitive or unfair practices compelled by a foreign sovereign as a condition of the right to do business in that country.