INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, ("IAM"), an association, Plaintiff,

v.

The ORGANIZATION OF the PETROLEUM EXPORTING COUNTRIES ("OPEC"), the Democratic and Popular Republic of Algeria, ("Algeria"), the Republic of Ecuador, ("Ecuador"), the Gabonese Republic, ("Gabon"), Republic of Indonesia, ("Indonesia"), Imperial Government of Iran, ("Iran"), Republic of Iraq, ("Iraq"), State of Kuwait, ("Kuwait"), Libyan Arab Republic, ("Libya"), Federal Republic of Nigeria, ("Nigeria"), State of Qatar, ("Qatar"), Kingdom of Saudi Arabia, ("Saudi Arabia"), State of United Arab Emirates, ("United Arab Emirates"), and the Republic of Venezuela, ("Venezuela"), Defendants.

No. 78–5012–AAH (SX).

United States District Court,
C. D. California.

Sept. 18, 1979.

James H. Davis, Los Angeles, Cal., Albert E. Levy, San Francisco, Cal., Ackerman, Ling & Russell by James H. Ackerman, Long Beach, Cal., Plato E. Papps, Washington, D.C., Schwartz, Alschuler & Grossman by Benjamin F. Schwartz, Los Angeles, Cal., and Klinger & Leevan by Tobias G. Klinger, Los Angeles, Cal., for plaintiff.

Richard I. Fine, Arthur Soll, and Barry Cohen, Los Angeles, Cal., as amicus curiae, in pro. per., urging the granting of the injunction.

S. C. Yuter, New York City, as amicus curiae, in pro. per., urging the granting of the injunction.

Latham & Watkins by Philip F. Belleville, Los Angeles, Cal., and Antonin Scalia, Chicago, Ill., for Indonesia-U.S. Business Committee of the Indonesian Chamber of Commerce and Industry, as amicus curiae urging dismissal.

Holmes & Warden by Khalid Abdullah Tariq Al Mansour, San Francisco, Cal., and Faisal Bin Fahad Al Talal, San Francisco, Cal., for Concerned Black Americans in Support of Africa and the Middle East as amicus curiae urging dismissal.*

---

* Briefs of amici curiae urging granting of the injunction were filed by Joel D. Joseph, and Daniel J. Popeo, Washington, D.C., for the Washington Legal Foundation, Washington, D.C.; by Congressman Jim Leach, Washington, D.C., in pro. per. with general agreement by

## MEMORANDUM OF DECISION AND ORDER OF JUDGMENT FOR DEFENDANTS

HAUK, District Judge.

### INTRODUCTORY

In September, 1960, defendants Iran, Iraq, Kuwait, Saudi Arabia and Venezuela met in Baghdad, Iraq. The result of this meeting and subsequent meetings was the Organization of Petroleum Exporting Countries (hereinafter "OPEC"). Thereafter, defendants Algeria, Ecuador, Gabon, Indonesia, Libya, Nigeria, Qatar and The United Arab Emirates joined OPEC, bringing to 13 the number of member nations. The principal aim of this organization was stated as "the unification of petroleum policies for the Member Countries and the determination of the best means for safeguarding the interests of Member Countries individually and collectively." Resolution of the First Conference, Resolution 1.2(4). To accomplish this goal, the organization expressed the desire to "formulate a system to ensure the stabilization of prices by, among other means, the regulation of production, with regard to the interests of the producing and of the consuming nations, and to the necessity of securing a steady income to the producing countries, an efficient economic and regular supply of this source of energy to consuming nations. . . . " *Id.* Resolution 1.1(3). The system that was implemented by OPEC included, among other features, the setting of prices for the sale of their crude oil.

■ Plaintiff International Association of Machinists and Aerospace Workers (hereinafter "IAM") filed this action in December 1978, by way of Complaint and then a day later by way of First Amended Complaint, challenging the price setting activities of OPEC and its 13 member nations, naming each nation and OPEC as defendants. Plaintiff alleged that these price setting activities violated Section 1 of the Sherman Act, 15 U.S.C. § 1,[1] under which price fixing has, in a long line of cases,[2]

Congressman Tom Railsback, Washington, D.C.; by Public Advocates, Inc., San Francisco, Cal. by Angela Glover Blackwell and Robert L. Gnaizda, San Francisco, Cal., for American-G.I. Forum; by Simpson, Thacher & Bartlett, by Donald Oresman, New York City, for Gulf & Western Industries, Inc.; by Atty. Gen. Carl R. Ajello, and Asst. Atty. Gen. John R. Lacey, Hartford, Conn., for the Attorney General's Office of the State of Connecticut;

An additional joint Memorandum of Law urging the Court not to dismiss the case was filed by Charles A. Graddick, Atty. Gen. for the State of Alabama, Montgomery, Ala., Avrum M. Gross, Atty. Gen. for the State of Alaska, Juneau, Alaska, Robert K. Corbin, Atty. Gen. for the State of Arizona, Phoenix, Ariz., Carl R. Ajello, Atty. Gen. for the State of Connecticut, Hartford, Conn., Jim Smith, Atty. Gen. for the State of Florida, Tallahassee, Fla., Tom Miller, Atty. Gen. for the State of Iowa, Des Moines, Iowa, Robert F. Stephens, Atty. Gen. for the State of Kansas, Frankfort, Ky., Warren R. Spannaus, Atty. Gen. for State of Minn., St. Paul, Minn., Paul L. Douglas, Atty. Gen. for State of Nebraska, Lincoln, Neb., Richard H. Bryan, Atty Gen. for the State of Nevada, Carson City, Nev., Allen I. Olson, Atty. Gen. for the State of North Dakota, Bismarck, N.D., James A. Redden, Atty. Gen. for the State of Oregon, Salem, Or., William M. Leech, Jr., Atty. Gen. for the State of Tennessee, Nashville, Tenn., Mark White, Atty. Gen. for the State of Texas, Austin, Tex., Slade Gorton, Atty. Gen. for the State of Washington, Olympia, Wash., Bronson C. LaFollette, Atty. Gen. for the State of Wisconsin, Madison, Wis., and Chauncey H. Browning, Atty. Gen. for the State of West Virginia, Charleston, W.Va.

1. 15 U.S.C. § 1 provides:

 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

2. *See Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), *reh. den.* 390 U.S. 1018, 88 S.Ct. 1258, 20 L.Ed.2d 169; *United States v. General Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *United States v. McKesson & Robbins*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *Schwegmann Bros. v. Calvert Corp.*, 341 U.S. 384, 171 S.Ct. 745, 95

been ruled a *per se* violation.[3] The injury plaintiff has allegedly received is the payment of higher prices for gasoline at the service station pumps, by virtue of the anticompetitive actions taken by defendants and the antitrust violations involved. In this action, plaintiff asks for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15,[4] and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26,[5] praying this Court to enjoin the price setting activities of these defendants, OPEC and member nations. Plaintiff claims that jurisdiction of this Court is based upon the Foreign Sovereign Immunities Act of 1976 (hereinafter "FSIA"), 28 U.S.C. § 1602, *et seq.*, particularly 28 U.S.C. § 1605(a)(2),[6] as well as upon the Sherman and Clayton Acts.

On June 25, 1979, plaintiff moved for a preliminary injunction. At that time, none of the defendants had made an appearance in this action or had filed an opposition to that motion. Since default had been entered by the Clerk on only three of the defendants, and since the remainder of the defendants still had time within which they could file an answer, the motion for preliminary injunction was continued. This Court wanted to give each and every defendant a full opportunity to be heard prior to ruling on the motion for preliminary injunction. Furthermore, the Court was aware of the constraints of the FSIA, in particular the provision that "No judgment by default shall be entered by the court . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to

L.Ed. 1035 (1951), *reh. den.* 341 U.S. 956, 71 S.Ct. 1011, 95 L.Ed. 1377; *United States v. Paramount Pictures*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Moore v. Jas. H. Matthews & Co.*, 473 F.2d 328 (9th Cir. 1972); *Local 36 of Intern. Fishermen & Allied Workers of America v. United States*, 177 F.2d 320 (9th Cir. 1949).

**3.** The *per se* category of antitrust violations is made up of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to precise harm they have caused or business excuse for their use. *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978).

**4.** 15 U.S.C. § 15 provides:
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**5.** 15 U.S.C. § 26 provides:
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that

will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

**6.** 28 U.S.C. § 1605(a)(2) provides:
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

 . . . .

 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

 . . . . .

the court." 28 U.S.C. § 1608(e). Since the preliminary injunction sought by plaintiff would have given plaintiff a good measure of what it sought, it would have been inappropriate for this Court to proceed on an incomplete record without a full hearing. So the Court ordered the evidentiary hearing on the motion for preliminary injunction consolidated with the trial on the final injunction under Rule 65 of the Federal Rules of Civil Procedure, together with the evidentiary hearing on the motion for default judgment, all to be heard on August 20, 1979. In this manner, the requirements of 28 U.S.C. § 1608(e) could be fulfilled while allowing defendants sufficient time to appear and oppose this action and at the same time allowing plaintiff sufficient time to prepare and gather evidence in support of the injunction. Moreover, the Court also issued an Order To Show Cause asking for factual and legal assistance on some eighteen basic questions from the defendants, and from any other knowledgeable sources as *amici curiae*, with the requirements that plaintiff effect service on the defendants and on numerous Federal and State officials and agencies, and make copies available to the news media. See Appendix A.

In response, 11 briefs were submitted, and plaintiff and four *amici curiae* appeared by counsel. As ordered, the consolidated hearings and trial proceeded on August 20, 1979. As of that date, each of the 13 member nations had been validly served. Each, however, had chosen not to make an appearance in this action, and as a result, a default entry had been made by the Clerk of Court against each of the 13 member nations, with determination of whether the Court would make and enter a default judgment to abide the outcome of the hearings and trial.

What follows now shall constitute the Court's written findings of fact and conclusions of law, pursuant to Rule 52(a), F.R. Civ.P.

■ At the outset, the Court pointed out that OPEC could not legally be served either under FSIA, 28 U.S.C. § 1602 ff., or under the International Organizations Immunities Act, (hereinafter "IOIA"), 22 U.S.C. § 288 *et seq.*, or otherwise, holding that FSIA applies only to foreign sovereignties, which OPEC is not; and, IOIA applies only to those international organizations "in which the United States participates," and the United States does not participate in OPEC. The Court added its doubts that OPEC could ever be legally served with process. But, in any event, plaintiff and its counsel admitted that OPEC could not be and had not been legally served. Whereupon the Court dismissed OPEC from the lawsuit and out of the case entirely.

Thereupon the consolidated hearings and trial commenced and ran four days and four evenings, usually from 9:30 a. m. to anywhere from 8:30 p. m., to 11:30 p. m., with appropriate recesses for rest, physical relief and meals. At the conclusion of a full day of argument, the Court issued its oral decision from the Bench dismissing the case as against all the remaining defendants, to wit, the 13 nations, members of OPEC, and ordering judgment against the plaintiff.

### PLAINTIFF AS "INDIRECT PURCHASER"

#### 1. *Damages*

■ In the early stages of the proceedings, the Court dismissed the damage portion of plaintiff's complaint. Plaintiff did not allege any direct purchase from defendants. The injury claimed allegedly resulted from the purchase of gasoline here in the United States. Since plaintiff did not allege or show that it purchased any crude oil or gasoline from the defendants, or had any dealings with the defendants at all, it necessarily had to be and was and is an "indirect purchaser" of and from the defendants with respect to the gasoline it purchased in the United States. The most that plaintiff could show or claim was that it purchased in the United States, at service station pumps, gasoline which in part may have been refined in the United States by American companies from defendants' crude. Viewing the facts in a light most favorable

to plaintiff, it is clear that since the defendants' crude oil passed f. o. b. the particular defendant country's port, was sold and title passed from defendants to purchasers at such ports, was sold again and title passed again and again—through crude buyers, crude shippers, crude resellers, refineries, was re-refined into gasoline, then went through gasoline distributors and marketing wholesalers and gasoline retailers—until the gasoline was purchased by plaintiff at the service station pumps, plaintiff was and is at the very best an indirect purchaser, eight times removed from the defendants, that is, an indirect purchaser of domestic gasoline eight times removed from defendants, and not a direct purchaser of defendants' foreign crude.

As an indirect purchaser, plaintiff is precluded from seeking damages. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court held that a plaintiff in a price fixing case may recover only if it purchased directly from the alleged price fixer. An indirect purchaser may not recover on the basis of the so-called pass-on or pass-through doctrine, urged by plaintiff. Plaintiff cannot establish antitrust injury by showing that the additional cost imposed on crude oil by the price fixing defendants has been passed on to the plaintiff by the first direct purchaser from the defendants and any intermediate purchasers along the line through the refineries and on to the service station pumps as gasoline.

The *Illinois Brick* case followed the earlier decision of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In the *Hanover Shoe* case, the defendant, accused of monopolizing shoe machinery, attempted to defend against this charge by asserting that plaintiff was not injured by any acts committed by the defendant because the plaintiff, a shoe manufacturer, passed the additional costs along to the ultimate consumer. The Supreme Court rejected this pass-on or pass-through doctrine as a defense which could be asserted in an action for treble damages under § 4 of the Sherman Act, 15 U.S.C. § 4. The Supreme Court based its holding on the difficulties and uncertainties of proof concerning such a defense when it stated:

A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher prices had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.

*Hanover Shoe v. United Shoe Mach., supra*, 392 U.S. at 492–493, 88 S.Ct. at 2231.

Additionally, the Court was concerned about the antitrust laws losing their effectiveness if such a defense were allowed. If this defense was carried to the extreme, the only possible plaintiffs would necessarily be the ultimate customers who, in the instances in *Hanover Shoe*, were buyers of single pairs of shoes. Since such individuals would only have a tiny stake in a lawsuit and, therefore, little interest in it, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one would be available to bring and prosecute vigorously

any class action against them. *Id.* at 494, 88 S.Ct. 2224.

In *Illinois Brick*, the Court was faced with the choice of either carving out an exception to *Hanover Shoe*, or disallowing the use of the pass-on doctrine both offensively and defensively. In disallowing its use, offensively and defensively, the Court noted that "The principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions 'in the real economic world rather than an economist's hypothetical model,' 392 U.S., at 493, [88 S.Ct. at 2231], and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom." *Illinois Brick Co. v. Illinois, supra,* 431 U.S. at 731–732, 97 S.Ct. at 2068. The Court went on to find that "the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution." *Id.* at 732, 97 S.Ct. at 2068. Thus, the evidentiary complexities of the pass-on doctrine, where one could become mired in a determination of how much damage to apportion to each purchaser in a long chain of distribution, led the Court to reject the offensive use of this doctrine. Additionally, the Court was concerned with exposing defendants to multiple liability if the pass-on doctrine were allowed to be used offensively, but not defensively, because in such a situation, each purchaser in the chain of distribution could recover the full measure of his own injury, and damages, as well as the injury and damages of each purchaser below him, and yet the defendant could not offset the recovery of the first purchaser against the recovery of the second purchaser, or the recovery of any subsequent purchaser against any recovery of further subsequent purchasers, or *vice versa*. *Id.* at 730–731, 97 S.Ct. 2061.

The Court was also concerned about the problems of joinder inherent in such a situation, such as impossibility of joinder, frustrating attempts at class actions, difficulties in properly apportioning recoveries, and other inherent problems. *Id.* at 737–741, 97 S.Ct. 2061.

The Court did recognize that there may be instances where an indirect purchaser could be a proper plaintiff. A pre-existing cost-plus contract was cited as such an exception to the Court's opposition to application of the pass-on doctrine. The interaction of supply and demand would not complicate the damage determination in such a situation since the indirect purchaser would be tied to a fixed quantity with the overcharge being directly passed on. *Id.* at 736, 97 S.Ct. 2061. The Court also recognized that another situation where the pass-on doctrine might be allowed is where the direct purchaser is owned or controlled by its customer. *Id.* at 736 n. 16, 97 S.Ct. 2061.

In the present action, plaintiff does not even allege that it is a direct purchaser, and it is clearly an indirect purchaser. Plaintiff, however, asserts that it falls into the exceptions of *Illinois Brick* and has the right to maintain the action for damages. Plaintiff attempts to support this assertion based on three theories: (1) that certain Federal pass-through regulations are analogous to the cost-plus contract; (2) that domestic oil companies have conspired with the defendants; and (3) that the defendants control the United States oil companies with which plaintiff deals.

▆▆ The two primary features of the cost-plus contract which led the Court to cite this as a possible exception to *Illinois Brick* are: (1) a direct and easily measurable pass-on of costs; and (2) a commitment for a fixed quantity, precluding evidentiary complexities due to considerations of decreasing sales. The Federal pass-through regulations upon which plaintiff relies have neither of these characteristics. Plaintiff alleges that consumer prices for gasoline directly reflect any price increase by the OPEC nations, based on the pass-through

statute, 15 U.S.C. § 753(b)(2),[7] which allows a dollar-for-dollar pass-through of net increases in the cost of crude oil. Plaintiff's exhibits in support of its motion for preliminary injunction, however, irrefutably establish that the actual pass-through is accomplished in a banking mechanism. The oil companies "bank" these pass-throughs until such time, as they believe, the market will allow an increase in the price of gasoline. The pass-through, if it occurs at all, is not direct and is not easily measurable. Furthermore, consumers are not required to buy a fixed quantity of gasoline. Consequently, evidentiary problems much the same as in *Illinois Brick* could and most surely would arise. Therefore, this pass-through statute and the regulations of the Department of Energy thereunder, 10 C.F.R. 212.83, pp. 277–290 (1978), are not in any way analogous to a true cost-plus contract and cannot serve as an exception to *Illinois Brick*.

■ Plaintiff's contentions with respect to conspiracy with "certain private companies and other entities" (Plaintiff's First Amended Complaint, par. 24, page 11, lines 15–21), and control of them by the OPEC countries are equally frivolous. While plaintiff does allege a conspiracy in its complaint, the allegation is extremely general and vague. Plaintiff utterly fails to allege any facts to support a conspiracy charge, and does not even name any domestic oil companies as engaging in any such conspiracy, or being controlled in any way by OPEC or its members. Furthermore, plaintiff's complaint contains absolutely no allegations concerning control. Moreover, no evidence of any kind was adduced at the hearings and trial to show any kind of such conspiracy or control. Consequently, these contentions must fall.

The Court, therefore, must and does strike and dismiss from the First Amended Complaint the prayer for damages.

### 2. *Injunctive Relief*

Aside from seeking damages, plaintiff has prayed the Court to enjoin the defendants from continuing to conspire to fix prices. This claim is based on Section 16 of the Clayton Act, 15 U.S.C. § 26, which states in part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . .[8]

While the Supreme Court has spoken clearly and definitively concerning an indirect purchaser's right to seek damages in *Illinois Brick*, the Court has not made a definitive statement concerning the right of an indirect purchaser to seek injunctive relief. Both *Illinois Brick* and *Hanover Shoe* involved damage actions only, and the Supreme Court limited its ruling to the question of damages. Thus, whether an indirect purchaser may properly seek injunctive relief for an antitrust violation remains an open question.

In *Mid-West Paper Products Company v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979), the Court of Appeals for the Third Circuit held that *Illinois Brick* and *Hanover Shoe* do not preclude an indirect purchaser from seeking injunctive relief. The Court based this holding on the finding, at 590, that

in contrast to the treble damage action, a claim for injunctive relief does not present the countervailing considerations—such as the risk of duplicative or

---

**7.** 15 U.S.C. § 753(b)(2) provides in pertinent part:

(2) In specifying prices (or prescribing the manner for determining them), the regulation under subsection (a) of this section—

(A) shall provide for a dollar-for-dollar passthrough of net increases in the cost of

crude oil, residual fuel oil, and refined petroleum products at all levels of distribution from the producer through the retail level;

**8.** For full text of 15 U.S.C. § 26, see footnote 5, *supra*.

ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses—that the Supreme Court emphasized when limiting the availability of treble damages.

In support of this ruling the Court draws a distinction between Section 4 of the Clayton Act (15 U.S.C. § 15) which provides for damages for any person who shall be injured by conduct in violation of the antitrust laws, and Section 16 (15 U.S.C. § 26) which allows injunctive relief against threatened loss or damage. The Court went on to state that

> for purposes of § 16 the complainant "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur" . . . . *Id.* at 591 (footnote omitted).

This distinction between the plaintiff's obligation to show that he has actually been injured under Section 4, and plaintiff's obligation to show only threatened injury under Section 16, led the Court to conclude that

> the test for standing under Section 16 has been framed in terms of a proximate cause standard that is "less constrained" than that under § 4 and which might in fact be no more rigorous than the general rule of standing. *Id.* at 591–592 (footnotes omitted).

The Court also showed concern for plaintiffs that have obviously been damaged yet have been foreclosed from seeking relief, and additional concern for the enforcement mechanisms of the antitrust laws if these plaintiffs should be completely barred from seeking redress. *Id.* at 593.

■ A suit for injunctive relief does not present many of the problems that led the Court in *Illinois Brick* to preclude an indirect purchaser from seeking damages. For instance, as stated in *Hawaii v. Standard*

*Oil Co.,* 405 U.S. 251, 261, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972), "100 injunctions are no more effective than one." Thus the multiplicity of suit problem does not exist in the context of Section 16, injunctive relief. The remedy of an injunction does not give rise to recovery of a fund from which a Court would have the impossible task of attempting to apportion the recovery among a long line of indirect purchasers on a chain of distribution. Accordingly, some of the evidentiary and joinder problems that perplexed the Court in *Illinois Brick* are not present in an injunctive action. This is not to say, however, that all the evidentiary problems are nonexistent. The dynamics of the marketplace could still lead to extremely complex and complicated evidentiary problems in determining whether an indirect purchaser has been injured by the prohibited action. Counterbalanced against this possible difficulty of proof, however, is the recognition that should the indirect purchaser be precluded from seeking injunctive relief, he would be totally without any remedy for an injury that is many times all too real. In view of the desire of Congress for effective enforcement procedures under the antitrust law, this Court does not believe that Congress intended to totally exclude such a large class of potential plaintiffs from the protection of the antitrust laws. Accordingly, this Court agrees with the *Mid-West Paper* decision and concludes that an indirect purchaser may sue for injunctive relief under the antitrust laws. But this does not end the matter in some way favorable to plaintiff because we must look for and find jurisdiction if plaintiff is to prevail.

## JURISDICTION

■ Subject matter jurisdiction is granted to the district courts to hear actions against foreign states under 28 U.S.C. § 1330(a).[9] As explicitly provided by this

9. 28 U.S.C. § 1330(a) provides:
 (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of

this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

statute, however, district courts only have jurisdiction to hear such actions when the foreign state is not entitled to immunity. Consequently, the question of sovereign immunity has been given jurisdictional status by its express inclusion in this statute and must be the first question addressed by this court in determining whether this Court has been presented evidence satisfactory to support its jurisdiction to grant plaintiff's claim for relief.[10]

 Sovereign immunity is a doctrine of international law under which domestic courts must refrain from asserting jurisdiction over a foreign state. This doctrine was first recognized in the case of *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Until recently, when a foreign state wished to assert immunity, it would request the Department of State to make a formal suggestion of immunity to the court. The courts had begun to rely quite heavily on the practices and policies of the State Department and to place less emphasis on whether immunity was supported by the law and practice of nations, that is, international law.

 The theory of absolute sovereign immunity initially predominated all judicial discussion and decision. Under this theory, a foreign state could not be sued whatsoever without its consent. But as the law evolved in this area, a restrictive theory of immunity began to gather growing support. Under the restrictive theory, foreign states and sovereignties are not immune insofar as their commercial activities are concerned. This theory was first stated as United States policy in 1952 in a letter ("the Tate Letter") from the Acting Legal Advisor of the Department of State, Jack B. Tate, to the Acting Attorney General, Philip B. Perlman:

. . . . [T]he immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*). 26 Dep't State Bull. 984 (1952).

 In 1976, Congress enacted the Foreign Sovereign Immunities Act. The legislative history is clear that the Act codified the restrictive theory of sovereign immunity. Additionally, a principal purpose of this act was "to transfer the determination of sovereign immunity from the executive branch to the judicial branch thereby . . assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process." House Report No. 94–1487, p. 7, 5 U.S.Code Cong. & Admin.News (1976), pp. 6604, 6606. After the enactment of FSIA, any claim of sovereign immunity must be decided in conformity with principles set forth in this act. 28 U.S.C. § 1602.

Under it, the FSIA, foreign states are granted immunity from the jurisdiction of American courts subject to certain exceptions. 28 U.S.C. § 1604.[11] The only exception to immunity upon which plaintiff relies provides that foreign states are not immune in any case:

in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and the act causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2).

---

10. A Federal Court in every case must first determine, on its own motion if the question is not otherwise suggested, whether the court has jurisdiction. *Warner v. Territory of Hawaii*, 206 F.2d 851, 852 (9th Cir. 1953). Accordingly, whenever the question of lack of jurisdiction arises, whether it be by the parties, by the court itself, or by the suggestion of *amici curiae* as in this case, it is the duty of the court to review this issue of jurisdiction.

11. 28 U.S.C. § 1604 provides:

 Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

Accordingly, for this court to have subject matter jurisdiction the defendant must show that the activities engaged in by the defendants are "Commercial activities."

As shown by the evidence, the pricing mechanism used by the member nations involves mutual agreement on what is called the "government take." The government take is the amount of money the government will receive for each barrel of oil extracted within its borders and sold. Initially, each of the OPEC member sovereignties received this "take" by levying a tax on the foreign company extracting the oil or by charging the foreign company a royalty for the oils extracted. As each country gained a greater proprietary interest in the company extracting the oil, a greater amount of the "take" was derived from "buyback," a term used to signify the amount a foreign state receives through the ownership, partial or total, of the company extracting and selling the crude oil. Today, the "government take" is accomplished and maintained by taxation and direct price quotation and demand, supported by production controls, sometimes euphemistically referred to as "conservation."

While price-fixing is the more publicized aspect of the crude oil activities carried on by the OPEC countries, it is not the heart of the pricing mechanism for crude. The foundation of these activities is the ability and willingness to control production of crude oil. As testified by the preeminent expert in the field of World Petroleum Eco-

nomics, Dr. Morris A. Adelman, one of the two Court appointed experts: [12]

> Control of supply is the essence of monopoly; price fixing the result . . . . [T]he OPEC nations can raise or lower prices at will by controlling output. Most of the [crude oil] price increases since 1970 have in fact resulted from output restriction. Prices have also been raised by taxation and by direct price quotation. These two methods are convenient, but not necessary. Court Exhibit 26, Statement of M.A. Adelman. pp. 1, 12–13.

In order to determine whether these activities are "commercial activities," the Court must once again return to the FSIA for guidance. Section 1603(d) defines "commercial activity" as follows:

> A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its purpose. (Emphasis added.)

The legislative history in the House Report elaborates, referring to a foreign state's commercial acts as "those which private persons normally perform," and "of the same character as . . . might be made by a private person." House Report No. 94–1487, at pp. 14, 16 5 U.S.Code Cong. & Admin.News (1976), pp. 6613, 6615. If

---

**12.** The Court, dissatisfied with the apparent expertise and proposed testimony of the plaintiff's experts, Dr. Arnold E. Safer, Dr. James R. Kurth, and Dr. Stanley J. Foster, and after consulting the outstanding academic economic authorities in the United States, appointed as its own experts, Dr. M. A. Adelman, Professor of Economics at Massachusetts Institute of Technology, and Dr. Philip K. Verleger, Jr., Senior Research Scientist, School of Organization and Management, Yale University who until very recently had been working as Special Assistant to the Assistant Secretary for Economic Policy in the Department of the Treasury. Both of the experts were unanimously acknowledged by their peers as the two most outstanding and erudite experts in the field of both World and domestic petroleum economics.

That this action by the Court was a wise course is amply demonstrated by even a casual comparison between plaintiff's experts and the Court appointed experts, not only as to *expertise, compare* the curriculum vitae of Safer, Foster and Kurth (Exhibits 1, 7 and 10) *with* the curriculum vitae of Adelman and Verleger (Exhibits 25 and 37); but also as to testimony, *compare* testimony of Safer (Rep.Tr.552–900), testimony of Foster (Rep.Tr.903–1020) and testimony of Kurth (Rep.Tr.1022–1122, 1162–1185) *with* testimony of Adelman (Rep.Tr. 1230–1522) and testimony of Verleger (Rep.Tr. 1523–1615).

This comparison confirms the wisdom of the Court's complete reliance upon its own appointed experts as contrasted with its skeptical consideration of plaintiff's experts.

the activity is one which normally could be engaged in by a private party, it is a commercial activity and the foreign state is not entitled to immunity. House Report No. 94–1487 at 16, 5 U.S.Code Cong. & Admin. News (1976), p. 6615. If the activity is one in which only a sovereign can engage, the activity is noncommercial.

These standards are somewhat nebulous, however, in the context of a particular factual situation. As discussed by counsel for *Amicus Curiae*, Indonesia-U.S. Business Committee for the Indonesian Chamber of Commerce, the determining factor is how the court defines the act or activity. An act or activity can be defined broadly, such as "hiring of employees," an activity carried on by private parties, and thus, "commercial," or it can be defined narrowly, such as, "employment of diplomatic, civil service or military personnel," a governmental activity. It was suggested that in determining whether to define a particular act narrowly or broadly, the court should be guided by the legislative intent of the FSIA, to keep our courts away from those areas that touch very closely upon the sensitive nerves of foreign countries.

 This Court agrees that this "commercial activity" should be defined narrowly. This determination, while based partially on the factor mentioned above, is premised primarily on the recognition that a court must base its ruling on specific facts. By basing a ruling on a *generalized* view of the evidence, a court may be basing its ruling on half-truths. This Court is required to make its ruling upon the *specific* evidence presented in the evidentiary hearings and trial. From the evidence presented to this Court, it is clear that the nature of the activity engaged in by each of these OPEC member countries is the establishment by a sovereign state of the terms and conditions for the removal of a prime natural resource—to wit, crude oil—from its territory.

██ In determining whether the activities of the OPEC members are governmental or commercial in nature, the Court can and should examine the standards recognized under international law. The United Nations, with the concurrence of the United States, has repeatedly recognized the principle that a sovereign state has the sole power to control its natural resources. *See, e. g.*, Resolution 1803, G.A. Res. 1803, § I(1), 17 U.N. GAOR, 2d Comm. 327, U.N. Doc. A/C 2/5 R 850 (1962):

> *Bearing in mind* its resolution 1515 (XV) of 15 December 1960, in which it recommended that the sovereign right of every State to dispose of its wealth and its natural resources should be respected, *Considering* that any measure in this respect must be based on the recognition of the inalienable right of all States freely to dispose of their natural wealth and resources in accordance with their national interests, and in respect for the economic independence of States, . . .
>
> *Declares* that;
>
> 1. The right of people and nations to permanent sovereignty over their national wealth and resources must be exercised in the interest of their national development and of the well-being of the people of the State concerned.[13]

*Accord*, Charter of Economic Rights and Duties of States, G.A. Res. 3281, Ch. II, Art. 2(1), U.N. Doc. A/RES/3281 (XXIX) (1974); Declaration on the Establishment of a New International Economic Order in 1974, G.A. Res. 3201 (S–VI), § 4(e), U.N. GAOR, 6th Spec. Sess., Supp. (No. 1) 3, U.N. Doc. A/9559; Resolution 3171, G.A. Res. 3171, 28 U.N. GAOR 30 (Vol. 1) at 52, U.N. Doc. A/9030 (1973); Resolution 3016, G.A. Res. 3016, Preamble and § 1, 27 U.N. GAOR, Supp. (No. 30), U.N. Doc. A/8730; Resolution 2158, G.A. Res. 2158, § I(1), 21 U.N. GAOR, Supp. (No. 16) 29, U.N. Doc. A/6316 (1966). The United States' endorsement of this principle derives from its control, as a sovereign, of the development of its own

---

**13.** The United States voted in favor of Resolution 1803, which passed by a vote of 104–0–6. Resolution 1803, G.A. Res. 1803, § I(1), 17 U.N. GAOR, 2d Comm. 327, U.N. Doc. A/C 2/5 R 850 (1962).

lands and resources. *See, e. g.,* U.S. Constitution, Art. 4, Sec. 3, Cl. 2.

The control over a nation's natural resources stems from the nature of sovereignty. By necessity and by traditional recognition, each nation is its own master in respect to its physical attributes. The defendants' control over their oil resources is an especially sovereign function because oil, as their primary, if not sole, revenue-producing resource, is crucial to the welfare of their nations' peoples. As stated by Dr. Adelman:

> It is difficult or impossible to separate the OPEC governments as governments from their role as oil producers. They began their price fixing role by levying taxes on foreign companies operating within their borders. The oil revenues are the great bulk of governmental revenues. Indeed for the OPEC nations supplying most of the oil, the oil revenues are the great bulk of the whole national product. Court Exhibit 26, Statement by M.A. Adelman, p. 9.

We need not look beyond our own borders for examples of a government taking a determinative role in the marketing of its wealth and natural resources. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), involved an antitrust challenge to a California state program which controlled the marketing of raisins grown in the state, so as to restrict competition among the growers, and maintain prices. According to the defendants in that case, (California officials), the activity was for the benefit and protection of the public welfare. The Court, in reversing the grant of injunctive relief to plaintiff, held that the program was "an act of government," *Id.* at 352, 63 S.Ct. 307, and reasoned:

> [I]t is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and efficacy from the legislative command of the state and was not intended to operate or become effective without that command. *Id.* at 350, 63 S.Ct. at 313.

Similar activity has been carried on by other States and the Federal Government in this country. The discovery of the East Texas Oil Field in the early 1930's led to distressing conditions in the crude oil industry. This new oil became a drug on the market and was being sold for as little as 10 cents a barrel in Texas, at a time when the price throughout the country had soared to more than $3.00 a barrel. The State of Texas and other States, had, in order to prevent waste, and to conserve their natural resources, passed certain statutes and imposed restrictions requiring proration, and limiting the quantities that could be taken from the wells in various fields. The Federal Connally Hot Oil Act, 49 Stat. 30, 15 U.S.C. § 715, *et seq.,* was enacted by the Congress to enforce the state statutes, by prohibiting the shipment in interstate commerce of crude oil produced in violation of state laws and regulations. *United States v. Brumfield,* 85 F.Supp. 696, 699 (W.D.La. 1949). Thus, certain States in the United States have restricted production of crude oil in order to maintain and stabilize prices and, thereafter, the Federal Government not only acquiesced in this activity, but made the States' acts effective by the assistance of Federal law enforcement.

 In view of our own State and Federal domestic crude oil activities, there can be little question that establishing the terms and conditions for removal of natural resources from its territory, when done by a sovereign state, individually and separately, is a governmental activity.[14] Plaintiff,

---

14. The legislative intent of FSIA does state that a " 'regular course of commercial conduct' includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation." House Report No. 94–1487 at 16, 5 U.S.Code Cong. & Admin.News (1976) pp. 6614–6615.

Plaintiff contends that because the OPEC member nations have a proprietary interest in the oil companies which are extracting the oil from within their respective territories, the price fixing activities in which the defendants engage are necessarily "commercial" in view of this legislative intent. While it may be true that through their activities as partial or total owners of these companies, the defendant nations do engage in commercial activities, this does not mean, and the legislative intent does not support the conclusion, that all activities,

however, asserts that, while this may be true, the actions of the OPEC nations in coming together to conspire to fix prices is commercial and, thus, not immune. Plaintiff's position, however, is untenable. It is ridiculous to suggest that the essential nature of an activity changes merely by the act of two or more countries coming together to agree upon how they will carry on that activity. The action of sovereign nations coming together to agree on how each will perform certain sovereign acts can only, itself, be a sovereign act. The act derives its authority and efficacy from the command of the sovereign nation and is not intended to operate or become effective without that command.

█ In view of all the evidence presented, this Court finds that the activity carried on by the defendant OPEC member nations is *not* "commercial activity;" that, therefore, defendants are entitled to immunity under 28 U.S.C. § 1604; and that, consequently, this Court lacks subject matter jurisdiction under 28 U.S.C. § 1330(a).

█ And, since this Court lacks subject matter jurisdiction, it also lacks personal jurisdiction, as mandated by 28 U.S.C. § 1330(b).[15]

In concluding this phase of our decision, it is instructive and helpful to note that the United States Government itself has implicitly recognized the activities of the OPEC member nations to be *sovereign* activities in connection with the production and marketing of crude oil, when the United States entered into consent decrees with the so-called "Big Seven" or "Seven Sisters"—the 7 largest American oil companies doing business with the OPEC member nations. These consent decrees entered into on November 14, 1960, for a period of 25 years until November 14, 1985, in the Department of Justice Antitrust Division Case No. 1163, grant specific "exceptions" and "permissive provisions" allowing these American companies to engage in price fixing, production control and market allocation programs for crude oil when required to do so by the law of any foreign nation, specifically the sovereignties which later organized and became

even those remotely connected with these companies, are necessarily commercial. The fact that a nation owns and operates an airline company, does not mean that all government activities regulating the use of airspace, or the ingress and egress of airplanes to and from the nation's airports, are commercial activities. Accordingly, we must look to the specific activities in which the defendants engage.

Here, a clear distinction must be drawn between the activities each government engages in by virtue of its proprietary interests and the activities in which it engages by virtue of its status as a sovereign. The activities of which plaintiff complains are clearly governmental. These activities are engaged in by the defendants in their status as sovereigns and not in their status as proprietors. This determination is conclusively established by looking to the nature of these activities and comparing them with governmental activities of other nations as we have already done.

This determination is further supported by the activities of the nations herein involved. Prior to *any* proprietary interest in any oil extracting company, each defendant nation set the terms of the withdrawal of its resources, through the mediums of taxation and royalties.

Thus, the defendants were engaging in this governmental conduct setting terms for crude production long before they obtained any own-

ership in any production companies. It necessarily follows that these activities are engaged in by virtue of each defendant's status as a sovereign—because these activities preceded *any* proprietary interest. Therefore, the essential nature of the activity is governmental.

Furthermore, this governmental nature does not change merely because the medium through which the activity is accomplished has changed. When defendants' obtained ownership interests in their respective oil production companies, the media being utilized by the defendants to fix the terms of oil extraction were altered and were changed. Through their proprietary interests the nations could directly control the establishment of these terms. But this change in format does not change the essential nature of the activity, which is still governmental.

As a result, the conclusion is irrefutable that these activities are governmental in nature.

**15.** 28 U.S.C. § 1330(b) provides:

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

members of OPEC, and which are defendants herein. *United States v. Standard Oil Co. (New Jersey)*, 1960 CCH Trade Cases ¶ 69,849, p. 77,335, S.D.N.Y., Civil Action No. 86–27 (Nov. 14, 1960); *United States v. Gulf Oil Corp.*, 1960 CCH Trade Cases ¶ 69,-851, p. 77,344, S.D.N.Y., Civil Action No. 86–27 (Nov. 14, 1960).

## FOREIGN SOVEREIGNTY CANNOT BE DEFENDANT IN ANTITRUST ACTION

Even if subject matter jurisdiction did exist, dismissal of the complaint would still be necessary and appropriate. Section 1 of the Sherman Act provides in part that "[e]very *person* who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony . . . ." (Emphasis added.[16]) Any person guilty of such a felony is subject to liability for treble damages. 15 U.S.C. § 15. It is apparent from the statutory language that plaintiff is entitled to relief in the instant action only if the defendants are "persons" as that term is used in section 1.

Section 8 of the Sherman Act, 15 U.S.C. § 7, and section 1 of the Clayton Act, 15 U.S.C. § 12, define "person" or "persons," "to include corporations and associations existing under or authorized by the laws of the Territories, the laws of any State, or the laws of a foreign country." This statutory language does not support the conclusion that foreign sovereigns are "persons" subject to Sherman Act liability. The case law accords with this interpretation.

In *Parker v. Brown, supra*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that a domestic State is not a person who may be sued under the antitrust laws. The Court reasoned, at 351, 63 S.Ct. at 313:

The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. The Act is applicable to "persons" including corporations (§ 7), and it authorizes suits under it by persons and corporations (§ 15). A state may maintain a suit for damages under it, *Georgia v. Evans*, 316 U.S. 159, [62 S.Ct. 972, 86 L.Ed. 1346] but the United States may not sue for damages, *United States v. Cooper Corp.*, 312 U.S. 600, [61 S.Ct. 742, 85 L.Ed. 1071]— conclusions derived not from the literal meaning of the words "person" and "corporation" but from the purpose, the subject matter, the context and the legislative history of the statute.

There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only "business combinations." 21 Cong. Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by *individuals and corporations*, abundantly appears from its legislative history. (Emphasis added.)

These same considerations apply with equal force to foreign nations.[17]

---

**16.** For full text of Section 1 of the Sherman Act see Footnote 1, *supra*.

**17.** Plaintiff has argued that *Parker v. Brown* has lost its effect through the decisions in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) and *LaFayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). *Goldfarb* was an action challenging under § 1 of the Sherman Act a minimum fee schedule published by the Fairfax County Bar Association and enforced by Virginia State Bar. The State Bar and the County Bar attempted to use the *Parker v. Brown* doctrine as a defense be-

cause the State Bar was a State Agency and, as argued by the County Bar, the ethical codes and the activities of the State Bar prompted it to issue fee schedules. The Court, however, rejected these arguments, holding that anticompetitive activities must be compelled by direction of the State acting as a sovereign before the *Parker v. Brown* doctrine may be relied upon. 421 U.S. at 791, 95 S.Ct. 2004. The Court, finding that these activities were not compelled by the State, held that the *Parker v. Brown* doctrine did not apply to the activities of these State and County Bar defendants.

In *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 78 n. 14 (2d Cir. 1977), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), the court concluded that foreign sovereigns are not "persons" subject to Sherman Act liability. Plaintiff in that case alleged, *inter alia*, that certain private party defendants had entered into anticompetitive agreements with the government of Libya. Though Libya was not named as a defendant, the Second Circuit considered Libya's liability under the Sherman Act and held that "Libya cannot be guilty of a Sherman Act violation . . . because it is not a person or corporation within the terms of the Act but a sovereign state."

A similar conclusion is found in *Interamerican Refining Corporation v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1298 (D.Del. 1970), where the court held that "[t]he Sherman Act does not confer jurisdiction on United States courts over acts of foreign sovereigns. By its terms, it forbids only anticompetitive practices of persons and corporations." (footnote omitted). Later the court added: "The Sherman Act refers only to persons, not to states or nations, and both the Act and the Constitution would be badly misinterpreted to permit liability for acts of a sovereign." *Id.* at 1298 n. 18.

Plaintiff has asserted that this *stare decisis* precedent has been altered by the FSIA. Plaintiff relies on a reference contained in the Legislative History of the FSIA, House Report No. 94–1487, p. 19, 5 U.S.Code Cong. & Admin.News (1976), p. 6618, which provides:

> Neither the term "direct effect" nor the concept of "substantial contacts" embod-

ied in section 1603(e) is intended to alter the application of the Sherman Antitrust Act, 15 U.S.C. 1, *et seq.*, to any defendant. Thus, the bill does not affect the holdings in such cases as *United States v. Pacific & Arctic Ry. & Nav. Co.*, 228 U.S. 87, [33 S.Ct. 443, 57 L.Ed. 742] (1913), or *Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.*, [131 U.S.App.D.C. 226,] 404 F.2d 803 (D.C. Cir. 1968), cert. denied, 393 U.S. 1093, [89 S.Ct. 872, 21 L.Ed.2d 784] (1969). (footnotes omitted.)

Neither of the cases cited in the legislative history, however, supports a conclusion that a foreign nation may be sued for violating our antitrust laws. *United States v. Pacific & Arctic Co., supra,* involved an alleged conspiracy between American and Canadian carriers [not foreign sovereignties or nations] to monopolize certain transportation partly within and partly without the United States. Since this action was brought under our Federal Antitrust laws, a crucial question in this case was the extra-territorial reach of our domestic laws. The Court held that our laws did apply. Basic to the Court's reasoning was that the monopoly consisted of

> control to be exercised over transportation in the United States, and, so far, is within the jurisdiction of the laws of the United States, criminal and civil. If we may not control foreign citizens or corporations operating in foreign territory, we certainly may control such citizens and corporations operating in our territory, as we undoubtedly may control our own citizens and our own corporations. 228 U.S. at 106, 33 S.Ct. at 448.

Here, the activities in which the OPEC defendants are engaged, are conducted by each sovereign nation itself. Thus we can only conclude that the nation by its direction has compelled these activities.

Our case here is clearly distinguishable from *Goldfarb* by the simple fact that we are not dealing with an agency of the state but the state itself. Accordingly, *Goldfarb* does not apply here except to the extent that it further supports the determination that when the state itself is conducting the activity, there is no violation of the antitrust laws.

*LaFayette* is equally inappropriate. The Court concluded in *LaFayette* that municipali-

ties should not be excluded from the reach of the antitrust laws. The Court found that *Parker v. Brown's* exemption from the antitrust laws was limited to official action directed by the state. 435 U.S. at 412, 98 S.Ct. 1123. The Court supported its ruling by stating that "States' subdivisions generally have not been treated as equivalents of the States themselves." *Id.* (Footnote omitted). Once again, we are not involved with any subdivisions of the OPEC nations, but the nations themselves. Accordingly, *LaFayette* does not apply to our suit here.

572

The other case, *Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., supra,* arose from an attempt by American firms to deny another American firm access to a line of international shipping trade created by Congress for the general benefit of American shipping. This case, just as the *Pacific & Artic* case, did not involve a foreign sovereign, even tangentially. Congress was chiefly concerned with the continuing effectiveness of these two cases when it referred to the applicability of the Sherman Act to "any defendant." Since, in neither of these cases, was there any attempt to assert jurisdiction over a foreign state, Congress' concern cannot be interpreted to authorize a judicial assertion of jurisdiction over a foreign state for violation of our antitrust laws.

■ In addition, the language in the legislative history clearly tells us that the FSIA was not intended to alter the application of the Sherman Act. Prior to the enactment of the FSIA, the only definitive statement on this point was the holding in *Interamerican Refining Corp., supra,* 307 F.Supp. 1291 (D.Del.1970), that foreign nations are not "persons" who may be sued.

Therefore, this Court in this OPEC case is still bound by all the precedents to hold that the foreign sovereignties cannot be made defendants here, despite a recent Supreme Court decision allowing a foreign sovereignty to be an antitrust plaintiff.

In *Pfizer Inc. v. India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), the Supreme Court held that a foreign nation may be a "person" under our antitrust laws as a plaintiff for the purpose of bringing suit. The determining factor in the result reached by the Court was that it did not "require the Judiciary in any way to interfere in sensitive matters of foreign policy." 434 U.S. at 319, 98 S.Ct. at 591. To include

foreign nations within the ambit of "persons" who may be sued as defendants, however, would require judicial interference in sensitive foreign policy matters.[18] Since Congress has never indicated any intent to extend liability of the Sherman Act to actions of a foreign sovereign, and since the accepted doctrine is that "questions of 'general policy'—especially with respect to foreign sovereigns and absent explicit legislative authority—are beyond the province of the Judicial Branch," *Id.* at 330, 98 S.Ct. at 597 (Powell, J., dissenting), this Court must refrain from extending the *Pfizer* ruling beyond the strict confines of that case.

■ Therefore, a foreign nation may sue, but not be sued, under the United States antitrust laws[19] and, perforce, the Court is compelled here to dismiss the entire action against the defendants, members of OPEC, because they cannot be made defendants herein in this antitrust suit and no valid claim for relief can be alleged or proved against them.

## NO PROXIMATE CAUSE, NO INJUNCTIVE RELIEF

[29] Even if the activity of the OPEC nations were not sovereign and governmental in nature and even if a foreign state could be sued under the American Antitrust Laws, the evidence adduced at trial does not support the granting of an injunction. Plaintiff failed to show the requisite causal connection between the alleged injury (rise in domestic gasoline prices) and the alleged anticompetitive conduct (price fixing of OPEC crude oil prices). The evidence clearly demonstrated that the dramatic rise in prices in 1973–1974 and in 1978–1979 was primarily caused by factors other than a rise in the crude oil.

18. Giving a foreign sovereign the *option* to sue, merely allows the nation to use our judicial system if it wishes. Allowing foreign sovereigns to be sued, however, would *require* their presence in our courts. Thus the latter poses the greater threat to sensitive matters of foreign policy.

19. This determination is consistent with the Court's rulings concerning domestic States under the antitrust laws. States may sue, *Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942), but not be sued, *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), under the antitrust laws.

While plaintiff in án injunctive action under § 16 is required to show only threatened loss or damage, this damage must be proximately caused by the alleged anticompetitive actions of the defendants. *Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 590 (3d Cir. 1979); *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1174 (5th Cir. 1976); *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1132 (5th Cir. 1975); *Reibert v. Atlantic Richfield Company*, 471 F.2d 727, 731 (10th Cir. 1973). In order to demonstrate that the injury or damage was proximately caused by defendants' anticompetitive conduct, the plaintiff must demonstrate by a preponderance of the evidence that: (1) the alleged prohibitive conduct of OPEC was a substantial factor in the occurrence of any injury or damage to IAM; and (2) the plaintiff is engaged in activities intended to be protected by the American antitrust laws. *Reibert v. Atlantic Richfield Company, supra*, at 731. Plaintiff here (IAM) has utterly failed to meet the first of these two tests.

Plaintiff alleges that it has been damaged because it had to pay higher domestic gasoline prices by reason of the higher foreign OPEC crude oil prices attributable to the price fixing activities of the defendants, members of OPEC. Particularly, plaintiff alleges that the OPEC crude oil price hikes in 1973–1974 and in 1978–1979 resulted in higher domestic gasoline prices and were responsible for injury to plaintiff. Therefore, in order for the plaintiff to satisfactorily demonstrate causation, plaintiff must prove that the crude oil price increases were a substantial factor in the occurrence of the gasoline price hikes.

Dramatic gasoline price increases and dramatic crude oil price hikes did in fact occur during these two time periods, 1973–1974 and 1978–1979. Mere approximation of occurrence, however, does not demonstrate causation, in and of itself. Plaintiff is required to present specific evidence satisfactory to the Court to establish this causation. 28 U.S.C. § 1608(e). This, plaintiff has failed to do. Rather the evidence clearly and convincingly shows that the increase of domestic gasoline prices during these time periods was not the proximate result of increase in foreign OPEC members crude oil prices.

Domestic gasoline prices of late have principally been the result of a shortage of refinery capacity, Department of Energy allocation regulations, and shortages in crude oil at domestic refineries in 1973 and 1979. Federal regulations have also greatly discouraged refiners from adding much needed refining capacity. The quota required by the Mandatory Oil Import Program discouraged construction of additional refining capacity between 1958 and 1973. After 1973, Federal Energy Administration regulations promulgated under authority granted in the Emergency Petroleum and Allocation Act discouraged refiners from adding to refinery capacity by preventing them from recovering the incremental or marginal costs of the additional capacity. These margins had been essentially frozen at their nominal 1973 levels.

At the same time these Federal regulations were restricting the expansion of refining capacity, other Federal regulations were reducing the supply of gasoline. Two regulations promulgated by the Environmental Protection Agency, one prohibiting use of the additive MMT in unleaded gasoline and the other reducing the level of lead in gasoline, have both resulted in reduced production and availability of domestic gasoline.

In the context of this already restrained supply situation, an unexpected surge in domestic gasoline consumption in the latter half of 1978 significantly contributed to increased domestic gasoline prices. This unexpectedly high level of fourth quarter consumption caused refiners to reduce inventories below planned levels and thus further induced gasoline price increases. Ordinarily the loss in inventories could have been made up by increased utilization of refineries. Reduction in Iranian production (completely unrelated to any price fixing activities), however, decreased the world supply of crude oil, reduced the amount of crude oil available to the United States, and pre-

vented refiners from operating refineries at a level which would have enabled them to rebuild the reduced inventories. This lower level of inventories of domestic gasoline then substantially contributed to higher prices.

During this time of reduced availability of domestic gasoline due to lack of sufficient refining capacity and reduction of crude oil supply, additional Federal regulations increased the severity of this shortage. The Department of Energy promulgated a series of regulations for the allocation of petroleum products during a period of shortage which established a series of priorities for different types of users and established certain set aside requirements for government supply of gasoline. Because of the compulsory requirement of supplying "priority" customers and the necessity to hold aside the "set aside" gasoline under these regulations, many filling stations received only 80% of the gasoline they had received the year before. Thus, as soon as a crisis developed, both the Federal Department of Energy and various State energy offices stepped in to turn a small shortage into a large and horrendous shortage. The result was excessive price increases and long lines at domestic service stations. These increases in domestic gasoline prices once again demonstrate that Federal regulation of the petroleum market has posed a greater threat to the American consumer than any other single factor.

As can readily be seen, the rise in OPEC members' foreign crude oil prices was not a substantial factor in the rise of domestic gasoline prices. In fact, some respected economists believe that the increased domestic gasoline prices actually caused the rise in OPEC members' foreign crude oil prices. The increase of these crude oil prices occurred only after the gasoline price hikes. These hikes along with the Federal and State systems of controlled allocations created a climate where spot prices of foreign and even domestic petroleum were inevitably bid up. These higher prices on petroleum product markets signaled foreign crude oil exporters that the market would support higher crude oil prices. As made

clearly evident by this cause and effect relationship, the rise in foreign crude oil prices, including those of OPEC members, was not a substantial factor in the increased prices of domestic gasoline, and therefore was not the proximate cause of plaintiff's injury in, like the general public, being forced to pay higher prices for domestic gasoline.

 Even if plaintiff had been able to demonstrate that the increases of foreign OPEC members' crude oil prices was a substantial factor in the general rise of domestic gasoline prices, proximate cause could not have been shown without more specific evidence. Plaintiff was not maintaining and could not maintain, this action on behalf of the general public or the average American consumer. Rather the action here is necessarily being brought and maintained by a specific plaintiff (IAM), with the result that proximate cause must be established to connect the alleged prohibited conduct of the OPEC members in raising foreign crude oil prices to the specific injury allegedly suffered by plaintiff, IAM, in paying higher domestic gasoline prices. Here plaintiff did not even attempt to establish that the domestic gasoline it purchased was the product of any of the crude oil purchased from one of the defendant members of OPEC. All this Court could do is engage in nebulous speculation as to whether plaintiff was a purchaser of gasoline manufactured from defendants' product, in any way at all. Once again, proximate cause has not been established by the plaintiff and the Court must deny plaintiff's prayer for injunctive relief.

### NO DEFAULT JUDGMENT AND NO WAIVER

Under 28 U.S.C. § 1608(e) the Court cannot enter a default judgment automatically upon failure or refusal of a foreign sovereign to appear after being served as required by the Foreign Sovereign Immunities Act. · The Court, as previously pointed out in the Order to Show Cause (Appendix A), and in the "Introductory" hereinabove

at page 4, must conduct a full and complete hearing to determine if the plaintiff [claimant] has established "his claim or right to relief by evidence satisfactory to the Court." This was one of the reasons the Court consolidated the full trial of the Final Injunction and hearing upon the Preliminary Injunction with this hearing on Default Judgment, and heard all relevant evidence. The Court is convinced that plaintiff did not carry its burden of showing by a preponderance of the evidence that it was entitled to any relief. A fortiori, this Court cannot and will not enter any Default Judgment against any of the defendants.

 Since no Default Judgment is entered here against any of the defendants', there is no waiver by defendants of their sovereign immunity, nor do they admit any of plaintiff's allegations concerning such sovereign immunity, each Defendant's sovereignty, or that the defendants' activities with OPEC concerning crude oil prices are in any way "commercial activities."

### CONCLUSION

 The Court should not conclude this discussion without reaffirming its admiration of plaintiff and its counsel for bringing this action, a commendation already stated by the Court at trial. In this suit, plaintiff has brought public attention in the United States and throughout the World to the frustration and anger all American gasoline consumers must feel about increasing domestic gasoline prices as a large part of the increasing costs of energy, a frustration in great part due undoubtedly to their own inertia and unjustified reliance on Federal and State bureaucracy. The Federal Executive Branch, through its Cost of Living Council and regulations, its Federal Energy Administration and Emergency Petroleum Allocations, its Department of Energy and accompanying maze of enigmatic and incomprehensible regulations, along with inept State interventions, has helped to create the energy crisis, has helped to intensify this crisis, and has utterly failed to resolve it, through inaction and ineffective action, as illustrated by the domestic gasoline price increases and long service station lines. When the Executive Branch so completely falters in its handling of an obvious and major problem, it is extremely tempting for the Court to take the initiative. However, we must recognize that we are a court of limited jurisdiction with the ability to handle problems only within the confines of the law and only within the power granted to this Court by Congress. Through its Order to Show Cause of June 25th, the Court endeavored to give the Executive Branch every opportunity to assist the Court in its handling of this matter. The Executive Branch, however, remained silent, perhaps hoping this storm would blow over.

With the persistent initiative of plaintiff, aided by the outstanding amicus curiae briefs and through oral argument submitted on behalf of plaintiff by Richard A. Fine, Esq., and S.C. Yuter, Esq., in propria persona, and submitted by Latham and Watkins and Antonin Scalia, Esq., on behalf of amicus, Indonesia-U.S. Business Committee of the Indonesian Chamber of Commerce and Industry, and by Holmes and Warden, and Khalid Abdullah Tariq Al Mansour, Esq., and Faisal Bin Fahad Al Talal, Esq., on behalf of amicus, Concerned Black Americans In Support of Africa and the Middle East, the Court has been able to arrive at a just and legally unassailable position here. While this action must be dismissed, the storm and crisis still exist and will not be resolved through inaction. It is only to be hoped that the Executive Branch as the Federal Governmental leader in the field of Foreign Relations, as well as domestic and international Energy, will now take over and bring appropriate relief to the American consumer in the entire field of Energy, and particularly in foreign as well as domestic crude oil prices and domestic gasoline prices. To do less, or to put the burden back on the Judicial branch again is intolerable.

This Court may only act where Congress has given it power to act. For purposes of asserting jurisdiction over a foreign sovereign, Congress has given this Court power to act only when the sovereign does not

have immunity from suit. Here the sovereign does have immunity from suit because the activity of which plaintiff complains is, by its nature, sovereign and governmental. There being no waiver, express or implied, of this immunity by the defendant nations, the Court is powerless to act.

Even if the Court did have jurisdiction to act, the defendant nations could not be held accountable for their activities under American antitrust laws. Foreign nations are not persons who may be sued under the American antitrust laws. While the Supreme Court did recently hold that foreign nations may bring suit for violations of American antitrust laws, this Court will not extend this ruling in the absence of a clear Congressional mandate changing the antitrust laws so as to permit the joining of a sovereign state as a defendant.

Plaintiff also failed on the merits. The requisite proximate cause was not established by evidence satisfactory to the Court. The causal connection between the alleged violation and the alleged injury was not shown *generally*, because the evidence revealed that the principal determinants of the price of gasoline were other than the rise of crude oil prices. Neither was this causal connection shown *specifically*, because the plaintiff failed to establish through specific evidence that it was a buyer, directly or indirectly, of crude oil which originated from any of the defendant nations.

As a result, this Court has no alternative but to terminate this action in favor of the defendants and against the plaintiff, and the Complaint and First Amended Complaint must be dismissed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

### APPENDIX A

ORDER TO SHOW CAUSE Re: Viability of Suit; Issues Therein; and Determination Thereof;

ORDER CONTINUING HEARING ON PRELIMINARY INJUNCTION;

ORDER SETTING CASE FOR TRIAL ON FINAL INJUNCTION, AND EVIDENTIARY HEARING RE DEFAULTS

### AND

CONSOLIDATING TRIAL AND EVIDENTIARY HEARING WITH HEARING ON PRELIMINARY INJUNCTION

ORDER FOR SERVICE

TO: PLAINTIFF herein, and its attorneys and counsel of record.

TO: DEFENDANTS herein, and each of their respective attorneys and counsel, whether of record or not.

TO: UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF JUSTICE, and ATTORNEY GENERAL OF THE UNITED STATES; UNITED STATES DEPARTMENT OF STATE and SECRETARY OF STATE OF THE UNITED STATES; UNITED STATES DEPARTMENT OF ENERGY and SECRETARY OF ENERGY OF THE UNITED STATES; and their attorneys and counsel, ATTORNEY GENERAL OF THE UNITED STATES and UNITED STATES ATTORNEY, CENTRAL DISTRICT OF CALIFORNIA.

TO: STATES OF THE UNITED STATES and SECRETARY OF STATE and ATTORNEY GENERAL of each State, and their respective attorneys and counsel.

### AND

TO: All persons and entities to whom these presents shall come, concern or appertain, and their respective attorneys and counsel.

YOU AND EACH OF YOU WILL PLEASE TAKE NOTICE that because of the complexities of the within lawsuit, the difficulties in framing the issues therein contained, and the far-reaching effects of judicial determination thereof, the Court has this day and date made and entered the following Orders:

## I. ORDER TO SHOW CAUSE

On MONDAY, AUGUST 20, 1979, at 10:00 o'clock A.M. Pacific Daylight Saving Time, or as soon thereafter as attorneys and counsel can be heard, in Courtroom 1, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012, the above entitled United States District Court, Central District of California, the Honorable A. Andrew Hauk, Judge Presiding, will hear: from any and all of the aforesaid parties, persons, entities, organizations, sovereigns, sovereignties; from all departments, agencies and · instrumentalities thereof; and from any and all attorneys and counsel thereof: any and all cause, causes, reasons, rationales and theories which they or any of them have and desire to present, express or suggest to the Court with respect to, in support of or in opposition to, in question of or in answer to any or all of the following inquiries:

### GENERAL

1. Is the within lawsuit a viable, valid, legal, proper and justiciable controversy validly and legally brought in and pending before this Court?

2. Does the within lawsuit raise any issue or issues that are or can be validly and legally determinable in and by this Court?

3. Are any or all of the issue or issues which the within lawsuit raises validly and legally determinable only by the Legislative and/or Executive branches of the United States Government rather than by the Judicial branch thereof?

4. Are the acts and activities of defendants, as alleged by plaintiff in the within lawsuit "Acts of State" *not* within the reach, purview or coverage of the laws of the United States, and therefore not within the jurisdiction of the United States Courts, and more particularly this Court?

### SUBJECT MATTER JURISDICTION

5. Does the within lawsuit sufficiently state or set forth any valid and legal claims for relief, or raise any issues under and by virtue of the Foreign Sovereign Immunities Act of 1976, 28 United States Code §§ 1602–1611, Public Law 94–583, 90 Stat. 2892 (Oct. 21, 1976), so as to invest subject matter jurisdiction in this Court?

6. Does the within lawsuit sufficiently state or set forth any valid and legal claims for relief, or raise any issues under and by virtue of the Sherman Antitrust Act, Section 1, 15 United States Code 1, and the Clayton Act, Sections 4 and 16, 15 United States Code 15 and 26, so as to invest subject matter jurisdiction in this Court?

7. Do any of the acts and activities of the defendants, as alleged by plaintiff in the within lawsuit, constitute "commercial activity [carried on] in the United States [by the foreign state]," 28 U.S.C. 1605(a)(2) and 1603(d); or "commercial activity carried on [elsewhere] and having substantial contact with the United States," 28 U.S.C. 1605(a)(2) and 1603(e); or "an act performed in the United States in connection with a commercial activity [of the foreign state] elsewhere," 28 U.S.C. 1605(a)(2); or "an act outside the territory of the United States in connection with a commercial activity [of the foreign state] elsewhere and that act causes a direct effect in the United States," 28 U.S.C. 1605(a)(2)?

8. Is the within lawsuit "[a case] not otherwise encompassed in paragraph (2) above [28 U.S.C. 1605(a)(2)], in which money damages are sought against a foreign state for . . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment," except "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused" and except "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," 28 U.S.C. 1605(a)(5)? *Note*: Legislative History seems to indicate this kind of a case was intended to cover "a traffic accident or other noncommercial tort," 1976 U.S.Code

Cong. & Admin.News, Vol. 5, p. 6604 at p. 6620, 94th Cong. 2d Sess., and would appear irrelevant in the context of the within lawsuit.

## IN PERSONAM JURISDICTION

9. Have any or all of the defendants been validly and legally served with process, i. e., Summons and Complaint and First Amended Complaint, under and by virtue of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. 1608? If so, which defendant or defendants, and in what manner? Does any such service invest in personam jurisdiction in this Court over the defendant or defendants so served?

## PLAINTIFF'S RIGHT TO SUE; STANDING

10. *Damages—Clayton Act, Section 4, 15 U.S.C. 15*

Is not plaintiff precluded from bringing the within lawsuit against defendants, in that plaintiff is an indirect purchaser of gasoline sold to plaintiff by and through third parties other than defendants, which gasoline was manufactured and refined by said third parties from oil produced and sold by defendants directly to said third parties; and further in that plaintiff utilizes and relies upon so-called "pass on" and "pass through" theories to support its claim for damages allegedly suffered by paying higher and higher prices from time to time for said gasoline, which gasoline prices plaintiff claims were raised and caused to be raised by reason of the higher and higher oil prices fixed and raised by defendants, which oil price raises were "passed on" or "passed through" to plaintiff by the third party intermediate buyers of oil produced by defendants, which third party intermediate buyers manufactured and refined into the gasoline ultimately purchased by plaintiff? *Note*: See *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), particularly at 728–729, at 735–736, and at 744–748, 97 S.Ct. 2061, wherein the United States Supreme Court in a 6–3 decision, while not addressing the standing issue, applies the *Hanover Shoe* [*Hanover*

*Shoe Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)*] doctrine against defensive use of "pass on" theories by antitrust defendants to *offensive* use of such "pass on" theories by antitrust plaintiffs who are indirect purchasers from intermediate third parties other than defendants.

11. *Injunctive Relief—Clayton Act, Section 16, 15 U.S.C. 26*

Although by the ruling of *Illinois Brick*, *supra*, the Supreme Court effectively bars, or may effectively bar, plaintiff's claim for damages against defendants, does it bar injunctive relief in favor of plaintiff and against defendants? *Note*: See *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979) wherein the Court of Appeals for the Third Circuit in a 2–1 decision, holds that indirect purchasers have standing to sue for and obtain injunctive relief under Clayton Act, Section 16, 15 U.S.C. 26, even though barred from damage actions under Clayton Act, Section 4, 15 U.S.C. 15, by the Supreme Court in the *Illinois Brick* case, *supra*.

## DEFAULT ENTRY AND DEFAULT JUDGMENT

12. Is plaintiff, by reason of effective, valid and legal service of process, entitled to *Default Entry by Clerk* when a defendant fails or refuses to file and serve "an answer or other responsive pleading to the complaint within sixty days after service [upon such defendant]," 28 U.S.C. 1608(d)? If so, as against which defendant or defendants, and why? What is the effect of any such *Default Entry by Clerk*?

13. What must the Court do by way of evidentiary hearing before making or entering an effective, valid and legal *Default Judgment*, in order to comply with the mandatory language of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. Section 1608(e) which provides:

"(e) No judgment by default shall be entered by a court of the United States . . . against a foreign state, a politi-

cal subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

14. In this connection, "since sovereign immunity is an affirmative defense which must be specially pleaded, the burden will remain on the foreign state to produce evidence in support of its claim of immunity." Legislative History, 1976 U.S.Code Cong. & Admin.News, Vol. 5, p. 6616. In other words, the foreign state must produce prima facie evidence of immunity. What, therefore, is the effect of the foreign state's failure to answer or file a responsive pleading? What is the result of a default judgment against the foreign state? Does this mean that the foreign state by failing to assert the affirmative defense and by defaulting, has explicitly or by implication waived immunity and left itself open by way of default judgment against it for injunctive relief?

### ATTACHMENT OR EXECUTION

(Attachment in Aid of Execution)

15. *Before Judgment Against A Defendant's Property Used For A Commercial Activity In The United States.*

Does the Court have any jurisdiction or power to issue a writ of attachment (garnishment, sequestration, arrest or seizure) *pendente lite* against property in the United States belonging to a defendant, *prior* to entry of Judgment? If so, is not that jurisdiction and power limited to situations where:

(a) the defendant has *"explicitly* waived" immunity against pre-judgment attachment; and

(b) "the purpose of the attachment is to secure satisfaction of a judgment that has been or ultimately may be entered against the foreign state, and not to obtain jurisdiction." 28 U.S.C. 1610(d)(1) and (2). [Emphasis ours].

16. *After Judgment Against A Defendant's Property Used For A Commercial Activity In The United States.*

Does the Court have any jurisdiction or power to issue a writ of execution (or a writ of attachment in aid of execution) against property in the United States belonging to a defendant *after* entry of Judgment? If so, is not that jurisdiction and power limited to situations where:

(a) "the foreign state has waived its immunity . . ." either *explicitly* or by *implication* ; *or*

(b) "the property is or was used for the commercial activity upon which the claim is based," *or* 28 U.S.C. 1610(a)(1) and (2) (Emphasis ours, and other permissive executions *after judgment* in the Act are not relevant.) *or*

(c) The execution or attachment in aid of execution is against property of an "agency or instrumentality of a foreign state," which agency or instrumentality has "waived its immunity . . . either *explicitly* or by *implication,*" or "the judgment relates to a claim" under 28 U.S.C. 1605(a)(2) or (5), "regardless of whether the property is or was used for the activity upon which the claim is based." 28 U.S.C. 1610(a)(1) and (2) (Emphasis ours).

17. In connection with inquiries 14 and 15 above, what is the proper, valid and legal meaning of the word "explicitly" when applied to waiver of immunity? And what is the meaning of the words "explicitly or by implication" when applied to waiver of immunity in 28 U.S.C. 1610?

### PROPRIETY OF PRELIMINARY INJUNCTION

18. Has plaintiff met the conditions necessarily prerequisite to obtaining a preliminary injunction? Has it demonstrated or can it demonstrate to the satisfaction of the Court that:

1. It is probable and there is a clear likelihood that plaintiff will, after trial on the merits, prevail and be

awarded judgment against defendants, either for damages or for final injunctive relief?

2. Is the injury, damage and hardship to defendants that would be caused by the Court in granting the preliminary injunction be outweighed by the injury, damage and hardship to plaintiff that would be caused by the Court in not granting the preliminary injunction?

3. Is any injury or damage suffered or allegedly anticipated to be suffered by plaintiff irreparable and certain to occur?

4. Is it in the public interest to grant the preliminary injunction to plaintiff?

## II. ORDER CONTINUING HEARING ON PRELIMINARY INJUNCTION

IT IS FURTHER ORDERED THAT the hearing of plaintiff's Motion For a Preliminary Injunction be and the same is hereby continued for further hearing to the date of MONDAY, August 20, 1979, in Courtroom 1, United States Courthouse, Los Angeles, California 90012, the Honorable A. Andrew Hauk, Judge Presiding.

## III. ORDER SETTING CASE FOR TRIAL ON FINAL INJUNCTION AND EVIDENTIARY HEARING RE DEFAULTS AND CONSOLIDATING TRIAL AND EVIDENTIARY HEARING WITH HEARING ON PRELIMINARY INJUNCTION

IT IS FURTHER ORDERED that, pursuant to Rule 65(a)(2), F.R.Civ.P., the trial on the merits of the Final Injunction sought in the within lawsuit, and pursuant to 28 U.S.C. 1608(e) the evidentiary hearing re defaults, be and the same hereby are consolidated with the further hearing on plaintiff's Motion for a Preliminary Injunction, and the said trial on the merits of the Final Injunction, the said evidentiary hearing re defaults, and the further hearing on Preliminary Injunction be and the same are hereby set for MONDAY, AUGUST 20, 1979, in Courtroom 1, United States Courthouse, Los Angeles, California 90012, the Honorable A. Andrew Hauk, Judge Presiding.

## IV. ORDER FOR SERVICE

IT IS FURTHER ORDERED that attorneys and counsel for plaintiff shall serve a copy of this Order to Show Cause upon the plaintiff and all persons who have appeared in the within lawsuit by serving it or its, or them or their, respective attorneys and counsel of record, by registered mail, return receipt requested; upon all defendants who have not appeared herein, and their attorney and counsel by serving said defendants by registered mail, return receipt requested, and by following the procedure of service through the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services, as provided in the Foreign Sovereign Immunities Act, 28 U.S.C. 1608(a)(4); upon the United States of America, and its Department of Justice and Attorney General, its Department of State and Secretary of State, its Department of Treasury and Secretary of Treasury, its Department of Energy and Secretary of Energy by registered mail, return receipt requested, addressed to the Attorney General of the United States, United States Department of Justice, Washington, D.C. and to the United States Attorney, Central District of California, United States Courthouse, Los Angeles, California 90012; upon each and all States of the United States and each respective Governor, Secretary of State and Attorney General, by registered mail, return receipt requested, addressed to the Honorable Attorney General of each State of the United States, at the State Capitol Building of each such State; and upon all other persons to whom this Order shall come, concern, or appertain, by making copies hereof available to all news media and to any such persons requesting a copy. Such copy and service thereof shall be effected and effective if made and done, including service of a copy of the First Amended Complaint and Summons upon those not as yet served therewith, all in the

English language. And all pleadings, motions, answers, points and authorities, and papers of every kind desired to be filed by any of the persons served shall be filed in the within Court and with its Clerk of Court on or before Wednesday, August 1, 1979, and served upon attorneys and counsel for plaintiff, Law Offices of Richard I. Fine, 10100 Santa Monica Boulevard, Los Angeles, California 90067 on or before the same date.

Dated: Monday, June 25, 1979

/s/ A. Andrew Hauk
UNITED STATES DISTRICT
JUDGE
CENTRAL DISTRICT OF
CALIFORNIA

## JUDGMENT FOR DEFENDANTS AND AGAINST PLAINTIFF

The Court having made and entered its Memorandum of Decision and Order of Judgment For Defendants, which constitutes its findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P., and good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That judgment is rendered in favor of defendants and against plaintiff, and the Complaint and First Amended Complaint herein, and each and every cause of action alleged or attempted to be alleged therein, be and the same are dismissed with prejudice, for lack of jurisdiction.

2. That judgment is rendered in favor of defendants and against plaintiff, and the Complaint and First Amended Complaint herein, and each and every cause of action alleged or attempted to be alleged therein, be and the same are dismissed with prejudice, because each and all defendants are sovereignties which cannot be made defendants in an Antitrust action under either the Sherman Act, Section 1, 15 U.S.C. 1, or the Clayton Act, Section 16, 15 U.S.C. 26, and no claim for relief under the said Antitrust laws can legally or properly be made, stated or shown by plaintiff against defendants.

3. That plaintiff take nothing of or from defendants, or any of them, and defendants have judgment against plaintiff on the merits.

4. That the Complaint and First Amended Complaint herein, and each and every cause of action alleged or attempted to be alleged therein against defendants or any of them, be and the same are dismissed on the merits.

5. That plaintiff pay its own costs of suit incurred herein.